756 A.2d 1139

**COMMONWEALTH of Pennsylvania, Appellee,**

v.

**Mark Newton SPOTZ, Appellant.**

Supreme Court of Pennsylvania.

Argued Nov. 15, 1999.

Decided Aug. 22, 2000.

See also 552 Pa. 499, 716 A.2d 580.

500

502

508

510

Bruce P. Blocher, Suzanne S. Smith, York, for Mark Newton Spotz.

Christy H. Fawcett, Robert A. Graci, Amy Zapp, Harrisburg, for Office of Atty. Gen.

Before FLAHERTY, C.J., and ZAPPALA, CAPPY, CASTILLE, NIGRO, NEWMAN and SAYLOR, JJ.

*OPINION*

CASTILLE, Justice.

This is a direct appeal from a sentence of death imposed by the Court of Common Pleas of York County.[1] On April 22, 1996, following a jury trial, appellant was convicted of first degree murder,[2] kidnapping,[3] robbery,[4] theft,[5] robbery of a motor vehicle,[6] carrying a firearm without a license,[7] and criminal conspiracy to commit first degree murder, kidnapping and robbery of a motor vehicle.[8] At the penalty phase, the jury determined that the four aggravating circumstances it found outweighed the two mitigating circumstances it found and, therefore, returned a sentence of death.[9] Post-verdict motions were denied and the trial court formally imposed the death penalty for the murder conviction. In addition, the trial court sentenced appellant to an aggregate consecutive term of 20 years and 9 months to 41 years and 6 months on the kidnapping, robbery, carrying a firearm without a license and conspiracy to commit murder charges. He received concurrent sentences on the remaining charges.

1. 42 Pa.C.S. § 9711(h)(1).

2. 18 Pa.C.S. § 2502(a).

3. 18 Pa.C.S. § 2901(a).

4. 18 Pa.C.S. § 3701.

5. 18 Pa.C.S. § 3921.

6. 18 Pa.C.S. § 3702.

7. 18 Pa.C.S. § 6106.

8. 18 Pa.C.S. § 903.

9. The aggravating circumstances were that appellant committed a killing in the perpetration of a felony, *see* 42 Pa.C.S. § 9711(d)(6); that appellant had a significant history of felony convictions involving the use or threat of violence to the person, *id.* § 9711(d)(9); that appellant had been convicted of another offense either before or at the time of the offense in issue for which a sentence of death or life imprisonment was possible, *id.* § 9711(d)(10); and that appellant had been convicted of another murder either before or at the time of the offense at issue. *Id.* § 9711(d)(11). The mitigating circumstances were that appellant was under the influence of extreme mental or emotional disturbance, *see id.* § 9711(e)(2), and any other evidence of mitigation concerning the character of the defendant and the circumstances of his offense, including a bad childhood. *Id.* § 9711(e)(8).

Although appellant has not specifically challenged the sufficiency of the evidence to prove murder, we begin, as we do in all death penalty direct appeals, by performing our self-imposed obligation to review the evidence underlying the first degree murder conviction. *Commonwealth v. Zettlemoyer*, 500 Pa. 16, 26–27 n. 3, 454 A.2d 937, 942 n. 3 (1982), *cert. denied*, 461 U.S. 970, 103 S.Ct. 2444, 77 L.Ed.2d 1327 (1983), *reh. denied*, 463 U.S. 1236, 104 S.Ct. 31, 77 L.Ed.2d 1452 (1983). In reviewing the sufficiency of the evidence, we must determine whether the evidence, and all reasonable inferences derived therefrom, when viewed in the light most favorable to the Commonwealth as verdict winner, supports the jury's finding of all of the elements of the offense beyond a reasonable doubt. *Commonwealth v. Rhodes*, 510 Pa. 537, 539–40, 510 A.2d 1217, 1218 (1986).

Evidence is sufficient to sustain a conviction for first degree murder where the Commonwealth establishes that the defendant acted with a specific intent to kill; that a human being was unlawfully killed; that the person accused did the killing; and that the killing was done with premeditation or deliberation. 18 Pa.C.S. § 2502(d); *Commonwealth v. Mitchell*, 528 Pa. 546, 551, 599 A.2d 624, 626 (1991). A specific intent to kill may be proven by circumstantial evidence; it may be inferred from the defendant's use of a deadly weapon upon a vital part of the victim's body. *Commonwealth v. Bond*, 539 Pa. 299, 305, 652 A.2d 308, 311 (1995).

The evidence adduced at trial showed that: at 6:20 a.m. on February 2, 1995, in York County, appellant approached Penny Gunnet's vehicle on the pretense of asking Ms. Gunnet for directions. Appellant aimed a nine-millimeter semiautomatic pistol at Gunnet and forced her into the passenger seat. He then drove the car to Indian Rock Dam Road, an isolated area, while his girlfriend, Christina Noland, followed him in a car they had stolen from June Ohlinger in Schuylkill County. While the two cars were stopped on Indian Rock Dam Road, Noland heard three gunshots. Soon afterwards, appellant sped off in Ms. Gunnet's car. Noland attempted to follow appellant in the Ohlinger vehicle, but she was unable to keep

up. Gunnet was eventually found under the wheels of her car, which had been abandoned by appellant. Thomas Stover and Patricia Eisenhart, two motorists, both positively identified appellant as the man they saw walking near the area where Ms. Gunnet's body was found.

Juan Maldonado testified that, on the day of the murder, appellant tried to sell him items of jewelry that had belonged to Ms. Gunnet. At that time, appellant informed Maldonado that he had a nine-millimeter semiautomatic pistol that was "dropping them like flies." Michelle Rhinehart, appellant's ex-wife, testified that less than 24 hours after the murder of Ms. Gunnet appellant gave her several rings that were later identified as belonging to Ms. Gunnet. Appellant also offered her several credit cards at the same time. Charles Carothers, another of appellant's acquaintances, testified that he heard appellant offer Rhinehart credit cards that appellant said would have to be used the next day. Carothers further testified that appellant confessed that he had shot his brother and had killed "these other ladies." Appellant told Carothers that he had thrown one woman off of a bridge and "the other lady he ran over with her car and she got stuck under it." Carothers also testified that appellant was in possession of the silver nine-millimeter semiautomatic pistol that was later identified as the weapon that fired at least two of the three nine-millimeter bullets recovered from Ms. Gunnet's car.

The police eventually tracked appellant to a motel room in Carlisle, Pennsylvania. When appellant opened the door to the room, he discarded a silver nine-millimeter semiautomatic pistol and surrendered to the police. A subsequent search of the room yielded appellant's bloodstained jeans, a knife, nine-millimeter "full metal jacket" ammunition, five credit cards issued in Ms. Gunnet's name and one credit card issued in Ms. Gunnet's husband's name. Ms. Rhinehart's fingerprint was found on one of the credit cards. Corporal James Rottmund of the Pennsylvania State Police, a ballistics expert, testified that two full metal jacket bullets that were recovered from Ms. Gunnet's car were conclusively fired from the gun seized from appellant.

Dr. Isidore Mihalikis, a forensic pathologist, testified that Ms. Gunnet died from two gunshot wounds. One bullet passed through Ms. Gunnet's neck, severing her jugular vein, piercing a carotid artery, and severing her spine before exiting the body. Another bullet entered her chest and pierced her heart and lungs before exiting the body. Dr. Mihalikis further testified that there were three bullet holes in Ms. Gunnet's vehicle. When appellant was arrested, he was found to have sustained a self-inflicted bullet wound to his thigh. The wound matched the trajectory of bullet holes in appellant's jeans, in the driver's seat and in the floor of Ms. Gunnet's car.

Appellant's accomplice, Christina Noland, testified for the Commonwealth. She related that, at the time appellant abducted Ms. Gunnet, they were escaping because appellant had shot his brother on January 31, 1995. She further testified that, prior to abducting Ms. Gunnet, she and appellant had committed a similar flight-induced crime in Schuylkill County. Specifically, they forced June Ohlinger into the passenger seat of Ohlinger's car at gunpoint, drove her to a remote, wooded area and shot her in the back of the head.[10] Commonwealth witness Dr. Richard Bindie, a board certified anatomical and clinical pathologist and forensic pathologist, testified that Mrs. Ohlinger had sustained a gunshot wound to the back of the head consistent with the use of a full-metal-jacket bullet. Ms. Noland testified that she and appellant took Ms. Ohlinger's car and money and drove to Rehoboth Beach, Delaware. In Delaware, they attempted to alter their appearances before returning to York County in search of another vehicle and

**10.** Appellant was tried separately and sentenced to death for his crimes arising from the killing of June Ohlinger in Schuylkill County. This Court affirmed the death sentence. *See Commonwealth v. Spotz,* 552 Pa. 499, 716 A.2d 580 (1998). Appellant was also convicted of first degree murder in Cumberland County and sentenced to death for the murder of Betty Amstutz, a murder which occurred while appellant was attempting to evade capture for the murder of Ms. Gunnet. That judgment is the subject of a separate appeal pending in this Court. *Commonwealth v. Spotz,* No. 202 Capital Appeal Docket. We note that, pursuant to the ruling of the trial court here, evidence of the subsequent killing of Betty Amstutz in Cumberland County was not introduced at this trial.

516

money for gas. Unfortunately, they happened upon Penny Gunnet.

Based upon the foregoing facts, overwhelming evidence was presented to support the first degree murder conviction. We now proceed to address appellant's allegations of error.

■ Appellant first claims that the trial court abused its discretion in denying his request to appoint new counsel and new standby counsel. Appellant alleges that there was a conflict of interest between himself and appointed counsel and, therefore, he was entitled to new counsel under Pa.R.Crim.P. 316(c)(ii). We discern no error here.

On March 14, 1996, approximately one month prior to trial, appellant's appointed counsel alerted the trial judge that they had received information that appellant was involved in a conspiracy to murder Christina Noland, his co-conspirator and a key Commonwealth witness. The court concluded that this disclosure by appellant's counsel was proper under Rule 1.6(c)(1) of the Rules of Professional Conduct.[11] Subsequently, on April 3, 1996, appellant's counsel alerted the court that they had received additional credible information that appellant planned to stab one of them in the neck with a pencil during the course of trial in order to secure a mistrial. During subsequent inquiries by the court, appellant's counsel repeatedly assured the court that they would still do their best to represent appellant. The court noted that, even if it appointed new counsel, the possibility would still exist that appellant would attack his new counsel in an attempt to cause

---

**11.** Rule 1.6 provides, in pertinent part:

(a) A lawyer shall not reveal information relating to representation of a client unless the client consents after consultation, except for disclosures that are impliedly authorized in order to carry out the representation, and except as stated in paragraphs (b) and (c).

. . .

(c) A lawyer may reveal such information to the extent that the lawyer reasonably believes necessary:

. . .

(1) to prevent the client from committing a criminal act that the lawyer believes is likely to result in death or substantial bodily harm or substantial injury to the financial interests or property of another. . . .

a mistrial. Although appellant denied that he intended to attack his counsel, as a security precaution, the court arranged for several officers from the sheriff's department to be in close proximity to appellant at all times during the trial.

On April 8, 1996, just before jury selection, appellant requested that new counsel be appointed for him because he believed that he had a conflict with appointed counsel that would hinder counsel from zealously advocating on his behalf. Specifically, appellant claimed that his appointed counsel were in fear of him to such an extent that rendered them incapable of representing him properly. In response, counsel informed the court that, while there was a level of distrust, they would represent appellant to the best of their abilities. Notably, counsel never asked to withdraw.

After the court denied the request for new counsel, appellant asked for leave to represent himself. The court conducted a full colloquy on the waiver of counsel in accordance with *Commonwealth v. Starr*, 541 Pa. 564, 664 A.2d 1326 (1995), and then granted appellant's request. As a cautionary measure, the court appointed the two public defenders who were previously representing appellant as standby counsel. Appellant then requested that new standby counsel be appointed, renewing his claim that counsel's alleged fear of him would prevent them from adequately acting as standby counsel. That request was denied, and appellant proceeded to repre-. sent himself in jury selection, assisted by appointed standby counsel.

Following jury selection, the court provided appellant with an opportunity to reconsider his decision to represent himself. During an extensive colloquy, appellant's counsel again assured the judge that, while they did have some concern that appellant may try to harm them, they could effectively represent appellant if he allowed them to. They further assured the court that, if there came a point at which they believed that they could no longer adequately represent appellant, they would immediately apprise the court of that fact. Nevertheless, appellant still elected to represent himself at trial.

 Pa.R.Crim.P. 316(c)(ii) provides that "[a] motion for change of counsel by a defendant to whom counsel has been assigned, shall not be granted except for substantial reasons." To satisfy this standard, a defendant must demonstrate that he has an irreconcilable difference with counsel that precludes counsel from representing him. *See Commonwealth v. Tyler*, 468 Pa. 193, 197, 360 A.2d 617, 619 (1976). The decision of whether to appoint new counsel lies within the sound discretion of the trial court. *Commonwealth v. Segers*, 460 Pa. 149, 154, 331 A.2d 462, 465 (1975).

The trial court acted properly here. When faced with a potential conflict between appellant and his counsel, the court investigated the matter and was assured by appellant's counsel that they would be able to advocate zealously on appellant's behalf. Furthermore, as the trial court recognized, the "conflict" here resulted from appellant's own conduct, and the security measures that his purported conduct required. Even if new counsel were appointed, the security concern—*i.e.*, that steps had to be taken to ensure that appellant did not injure counsel in the hopes of securing a mistrial—would remain. In response to appellant's threats and attempts to manipulate, the court took appropriate measures to ensure the safety of counsel and appellant's right to effective, conflict-free representation. There was no abuse of discretion by the trial court in refusing to appoint new counsel or new standby counsel for appellant.

 Appellant next asserts that the trial court abused its discretion when it granted the Commonwealth's motion to sever Christina Noland's case from his own. Both appellant and Noland were charged in connection with this murder. In May of 1995, the Commonwealth provided a notice of consolidation of the two cases. *See* Pa.R.Crim.P. 1127(B). On April 8, 1996, however, just prior to jury selection, the Commonwealth moved to withdraw the notice. Appellant asserts that, by granting the Commonwealth's motion and severing the cases, the trial court undermined his contention at trial that Noland had committed the murder.

■ Appellant raised a similar claim in his appeal in *Commonwealth v. Spotz,* 552 Pa. 499, 716 A.2d 580 (1998) (*Spotz I* ), a case in which this Court upheld his sentence of death for the murder of June Ohlinger in Schuylkill County. There, he argued that the trial court erred in denying his motion to compel consolidation of the prosecution of his case with Christina Noland's. As we explained in *Spotz I,* Rule 1127 was intended to provide greater authority to the Commonwealth to move for consolidation of cases than is provided to an individual defendant. We further noted that the Rule recognizes the "inherent discretionary power left to the district attorney, including the discretion as to which individuals shall be prosecuted and which shall not." *Spotz I,* 552 Pa. at 520, 716 A.2d at 590. Logically, since the rule recognizes some degree of deference to the Commonwealth's decision whether to consolidate a case, deference should also be given to the Commonwealth's decision *not* to proceed with consolidation. In addition, appellant cites no authority, and our research has uncovered none, which supports the notion, essential to his argument, that once cases have been consolidated, they must be tried together unless one of the defendants, rather than the Commonwealth, successfully moves for severance. Such a rule would be inadvisable to say the least, considering that a co-defendant may elect to plead guilty before trial or the Commonwealth may elect not to proceed against a co-defendant at all. It would be nonsensical for the trial court to insist that a co-defendant proceed to a joint trial merely because a remaining defendant prefers that course. This is especially so where one co-defendant becomes a cooperating witness on behalf of the prosecution.

■ There being no proscription against the ruling at issue, the only possible issue is whether granting the motion in this case was an abuse of discretion. It was not. The Commonwealth's motion to sever could not have come as a surprise to appellant; in the eleven months preceding trial, neither Noland nor her counsel were present at any proceedings related to appellant's case. Furthermore, appellant was well aware that Noland was going to testify for the Common-

wealth just as she had in *Spotz I*—indeed, there was evidence that he was plotting to kill her in order to prevent her from testifying against him. Finally, the granting of the motion did not prejudice appellant in his attempt to shift the blame to Noland for this particular murder. Noland was the Commonwealth's key witness and appellant had a full and fair opportunity to cross-examine her under oath. Throughout the trial, appellant sought to persuade the jury that it was Noland, rather than he, who had murdered Penny Gunnet. Had the jury accepted that defense, it could have assigned blame accordingly. The fact that appellant stood trial alone did not in any way hinder his ability to present his defense. Accordingly, the trial court did not err in granting the Commonwealth's motion to sever.

Appellant next contends that the trial court abused its discretion when it admitted into evidence two videotapes, one depicting the crime scene, and the other depicting the path of the Gunnet and Ohlinger vehicles near the time of Gunnet's murder. Appellant's argument is rather scattershot. He argues that this evidence was cumulative since the Commonwealth also presented photographs of the crime scene and a chart illustrating the route taken by the two vehicles. He also asserts that the videotapes cemented the Commonwealth's theory of the case without requiring the Commonwealth to cure unidentified "hearsay" issues or to prove the facts as narrated in the videotapes prior to their being shown. Further, he cites the Superior Court opinion in *Commonwealth v. Impellizzeri*, 443 Pa.Super. 296, 309, 661 A.2d 422, 428 (1995), and argues that the trial court abused its discretion by failing to conduct an *in camera* review of the videotapes before admitting them, and by failing to make a determination as to whether the material depicted on the videotapes was "supported by the evidence." Finally, he alleges that the trial court erred in allowing the Commonwealth to play that portion of the videotape that showed Penny Gunnet's legs protruding from under her vehicle.

Rulings on the admissibility of evidence are committed to the sound discretion of the trial court and will not be

disturbed on appeal absent a clear abuse of that discretion. *Commonwealth v. Koehler*, 558 Pa. 334, 356–57, 737 A.2d 225, 237 (1999). Appellant's various objections do not demonstrate such an abuse here.

■■■ Appellant's complaint premised upon the *Impellizzeri* case clearly fails. In its opinion, the trial court plainly states that, "The Court and its staff did view the tape, outside of the presence of either the Commonwealth or the defendant." Trial Court Opinion, p. 22. There is no reason to doubt the veracity of this statement. But even if the trial court had not conducted a preliminary *in camera* review, that fact would not automatically entitle appellant to relief. The purpose of *in camera* review is to determine admissibility. Assuming that *in camera* review is preferred, as *Impellizzeri* suggests, a failure to conduct such a review can be error only if the videotape should not have been admitted resulting in prejudice to the defendant. As we find, *infra*, that appellant has not shown the ultimate ruling on admissibility to be erroneous, no relief is due.

■■■ Appellant's claim that the court failed to determine whether the videotapes were "supported by the evidence" is also meritless. Appellant never develops this argument; for this reason alone, it fails. In any event, it is enough to say that, prior to admitting the tapes, the court required the Commonwealth to explain their relevance. The Commonwealth articulated several reasons for admission, not the least of which was the fact that the tapes would help the jury, which had been drawn from Delaware County, better understand the area in which the crime occurred, the time frame and the course of events. In addition, the Commonwealth made a proffer showing that the tape of the route the cars traveled was made under conditions that were substantially similar to those obtaining when the crime occurred. Appellant was free to argue why this proffer, and the evidence introduced in support of the tapes, was insufficient to prove their authenticity and relevance. He made no such showing below, and none here.

As for appellant's argument that the videotapes were cumulative and repetitive, the trial court could reasonably conclude that the jury could glean additional insights from viewing videotape in addition to still photographs and charts. Further, even if it is assumed that the videotape evidence was merely cumulative, that in and of itself would not entitle appellant to relief. Where evidence is cumulative of other, properly admitted evidence, any resulting error is harmless. *See Commonwealth v. Lopez,* 559 Pa. 131, 162 n. 22, 739 A.2d 485, 502 n. 22 (1999).

Finally, the trial court did not abuse its discretion by allowing the jury to see that portion of the crime scene videotape that depicted the victim's legs protruding from under her vehicle. Prior to admitting photographs of a murder victim, the trial court must decide if the photographs are inflammatory and, if so, whether the probative value of the evidence outweighs its potential to impassion jurors. *Commonwealth v. Auker,* 545 Pa. 521, 544, 681 A.2d 1305, 1318 (1996). The trial court noted that "the views of the car and the body were not bloodied or gruesome" and the exposure of the jurors to the victim's body was "minimal and not inflammatory." Trial Court Opinion, p. 22. A review of the videotape evidence corroborates the trial court's assessment that the footage was not likely to impassion the jury. Accordingly, this claim fails.

Next, appellant asserts that the trial court abused its discretion by admitting evidence of the earlier crimes he committed in Clearfield and Schuylkill Counties—*i.e.,* the Clearfield County shooting of his brother, Dustin Spotz, and the Schuylkill County murder of June Ohlinger and the theft of her car. Appellant claims that the admission of this evidence unfairly prejudiced him by causing the jury to conclude that, because he committed these other crimes, he must have murdered Penny Gunnet.

Initially, we note that an evidentiary decision will not be reversed absent a clear abuse of discretion by the trial court. *Koehler, supra; Commonwealth v. Lark,* 518 Pa. 290,

302, 543 A.2d 491, 497 (1988). Evidence of prior crimes or bad acts is generally not admissible if offered merely to show a defendant's bad character or a propensity to commit crime. *Commonwealth v. Richter*, 551 Pa. 507, 512, 711 A.2d 464, 466 (1998). But it is well settled that where such evidence is proffered for some relevant purpose other than to show criminal propensity or bad character, such evidence is admissible, subject to the probative value/prejudicial effect calculus that attends all rulings on admissibility. *Id. See also Spotz I*, 552 Pa. at 512–13, 716 A.2d at 586. We have recognized that evidence of prior bad acts or crimes may be admitted to show motive, intent, absence of mistake or accident, common scheme, plan, or design, or identity of the perpetrator of a crime. *Spotz I*, 552 Pa. at 512–13, 716 A.2d at 586. In addition, evidence of other crimes may be introduced where such evidence was part of the chain or sequence of events which became part of the history of the case in question and formed part of the natural development of the facts. *Id., citing Commonwealth v. Lark, supra.*

In the instant case, the admissibility of the prior crimes evidence was the subject of a pre-trial evidentiary motion. The trial court found that the other crimes "were part of a chain of events which formed the history of the case and were part of its natural development." Trial Court Opinion, March 22, 1996, p. 5. The court further concluded that the other crimes evidence was admissible to show motive, intent and identity. *Id.* at p. 6. The court was careful, however, to limit the evidence to proof of the shootings themselves without reference to the outcome of the trials in Schuylkill and Clearfield Counties.[12]

There was no abuse of discretion here. The other crimes evidence plainly was admissible to establish appellant's

12. The trial court also refused to admit evidence that, following the murder of Penny Gunnet, appellant murdered another woman in Cumberland County. Nor did it allow in evidence that Dustin Spotz had died as a result of the gunshot wounds inflicted by appellant. Thus, the trial court took seriously its responsibility to balance the relevancy and evidentiary need for the other crimes evidence against its prejudicial effect.

motive for the robbery and murder of Gunnet. To be admissible to show motive, the evidence must provide a sufficient ground to believe that the crime currently being considered grew out of, or was in some way caused by, the prior set of circumstances. *See Spotz I,* 552 Pa. at 513, 716 A.2d at 586–87. Here, the evidence at issue tended to show that appellant robbed and murdered Gunnet and stole her car in an effort to avoid capture for both the shooting of his brother and the robbery/murder of June Ohlinger. Specifically, the evidence showed that, after killing his brother in Clearfield County, appellant and Christina Noland fled together. In order to evade capture, they needed a car and money. To that end, they killed June Ohlinger and stole her car. When they approached Penny Gunnet, it was for the same purpose combined with a need to avoid capture for killing Ohlinger.

This Court has already held in *Spotz I* that evidence that appellant shot his brother in Clearfield County was relevant to demonstrate his motive for killing June Ohlinger. The shooting of his brother and the robbery/murder of June Ohlinger were admissible for a similar purpose in the instant case.[13]

Furthermore, when charging the jury, the trial court gave a limiting instruction explaining that "the [d]efendant is not charged with those crimes [committed in other counties] here in York County. . . . If they occurred, you decide if it's been established to you beyond a reasonable doubt that

13. Evidence of the Schuylkill County murder of June Ohlinger was independently relevant to show intent and identity. Appellant abducted June Ohlinger, drove her in her car to a rural area, shot her with a large caliber weapon loaded with full metal jacket bullets, and threw her body off of a bridge. In this case, appellant abducted Penny Gunnet, drove her to a rural area, shot her with a large caliber weapon loaded with full metal jacket bullets, and ran over her body. The similarity in these crimes was relevant to show both the identity of the killer and that appellant intended to kill Penny Gunnet.

Evidence of both prior crimes was independently admissible to show the sequence of events. The killing of Penny Gunnet did not occur in a vacuum, and the jury should not have been left with a misimpression that it did. Evidence of the prior crimes was admissible so that the jury could have an accurate understanding of the natural development of the facts here.

there's sufficient evidence there to show motive as far as the defendant's acts in York County to arrive at a conclusion as to what occurred here." N.T., April 22, 1996, at 2035. Thus, the trial court properly instructed the jury that it could only consider the other crimes evidence for its relevant limited purposes and not merely as evidence of appellant's propensity to commit crimes. For this additional reason, no relief is due. See *Spotz I*, 552 Pa. at 514–15, 716 A.2d at 587.

Appellant next contends that the trial court abused its discretion in admitting evidence of the crimes in Clearfield and Schuylkill Counties because appellant did not receive discovery regarding those matters until the first day of trial. Appellant is noticeably vague in describing the materials that comprised this discovery: apparently, it consisted entirely, or almost entirely, of the transcripts from his murder trials in those counties. Appellant, of course, was present at those trials and should have been familiar with the testimony. Moreover, although the trial court directed the Commonwealth to provide appellant with discovery relating to the two other crimes, if it planned on introducing evidence of those crimes, the transcripts were at all times equally available to appellant as they were to the Commonwealth. *See Commonwealth v. Rollins*, 558 Pa. 532, 550 n. 13, 738 A.2d 435, 445 n. 13 (1999) (no violation of *Brady* where prosecution failed to turn over evidence readily obtainable by, and known to, defendant); *Commonwealth v. Pursell*, 555 Pa. 233, 724 A.2d 293, 305 (1999) (same); *Westley v. Johnson*, 83 F.3d 714, 725–26 (5th Cir.1996) (no violation of *Brady* where prosecution failed to turn over testimony from co-defendant's separate trial, where allegedly inconsistent testimony was presented; transcript of co-defendant's trial was readily available using reasonable diligence).

Nevertheless, appellant claims that the Commonwealth violated Pa.R.Crim.P. 305(B)(1), relating to *mandatory* disclosure by the Commonwealth, in failing to produce the transcripts sooner. The claim is meritless on its face. The discovery at issue here was not "evidence favorable to the accused which is material either to guilt or to punishment." Pa.R.Crim.P.

305(B)(1). Thus, the Commonwealth did not violate the mandatory disclosure provisions by failing to deliver the transcripts sooner.

Although the transcripts were not subject to mandatory disclosure under either our Rules or under *Brady*, they nevertheless were the subject of a discovery order by the trial court. Specifically, on December 18, 1995, the trial court ordered the Commonwealth to provide information from the other prosecutions to defense counsel if it planned on presenting evidence of those crimes. On April 12, 1996, the first day of trial, the Commonwealth presented appellant with approximately 600 pages of trial transcript from the earlier prosecutions.[14] After appellant requested a delay to review the information, the trial court made special arrangements with the prison to provide appellant with early and late transport to and from the prison, extra privileges concerning use of the phone and visitation and exemptions from prison routines so that he could prepare his defense. Nonetheless, appellant maintains that the late provision of the materials rendered him unable to cross-examine effectively the witnesses who testified concerning the previous crimes. This claim lacks merit.

A defendant requesting relief as a result of tardy disclosure must demonstrate prejudice. *Commonwealth v. Simmons*, 541 Pa. 211, 237, 662 A.2d 621, 634 (1995). Even if it is assumed that the disclosure here could be deemed tardy, appellant has failed to demonstrate that he was prejudiced. Appellant had already been tried in Clearfield and Schuylkill Counties for the crimes that were the subject of the discovery. Therefore, he was familiar with the testimony of the witnesses in those cases. In fact, the Schuylkill County trial had ended just one month before the commencement of appellant's trial in the instant case. Furthermore, as appellant concedes in his brief, the materials that he was seeking were in the hands of

14. There is no evidence that the Commonwealth was other than diligent in providing these materials to appellant. The Commonwealth stated to the court that it had only received the materials in question one or two days before it turned them over.

the attorneys who represented him in the Clearfield and Schuylkill County cases. If prompt acquisition of the materials were imperative, he could have obtained the transcripts from his former attorneys, or could have asked his standby counsel in the instant case to obtain the transcripts for him. He did not do so. In light of these facts, any claim of prejudice rings hollow. Furthermore, even three years after the trial, appellant points to nothing specific in the transcripts that the alleged tardy disclosure prevented him from developing.[15] It is clear that appellant was not prejudiced by the fact that he did not receive the transcripts sooner. Accordingly, he is not entitled to a new trial on this issue.

Appellant next alleges that the trial court abused its discretion when it admitted evidence that the victim in the Schuylkill County case, June Ohlinger, was dead, rather than limiting that evidence to proof that Ohlinger had merely been "shot." At trial, the Commonwealth called Dr. Richard Bindie, the Schuylkill County pathologist, as a witness. Dr. Bindie testified that Ohlinger had "an obvious injury on top of her head and [that he] checked for rigor mortis and other signs of post mortem interval at the scene." He further testified that Ohlinger's skull "was open like an exploding type injury and the skull underneath the scalp was all exposed." The doctor also gave detailed testimony about the entrance and exit wounds. Appellant asserts that this testimony was harsh and inflammatory and prevented the jury from rendering a fair verdict.

As the trial court recognized, this claim is merely an extension of appellant's objection that evidence of his prior crimes

15. The only specific assertion made by appellant is that "there is information contained in the discovery regarding statements made by the co-defendant about looking through one of the victim's purses." According to appellant, this information contradicts the co-defendant's trial testimony on page 223 where, appellant says, "the co-defendant claimed, she did not touch the victim's purse." Brief of Appellant p. 36. Appellant has mischaracterized Noland's testimony. Noland never stated whether or not she touched the purse. All that she said was: "and he (appellant) went through the lady's purse and stuff." Furthermore, this portion of Noland's testimony concerns the murder of June Ohlinger, not the murder of Penny Gunnet.

should not have been admitted. But, as we have already held, evidence of the killing of June Ohlinger was relevant and admissible, and its relevance was not confined to the rather euphemistic fact that she was "shot." It was also relevant that appellant shot her after stealing her car, just as he did Ms. Gunnet. Furthermore, Dr. Bindie's testimony established that Ms. Ohlinger died from a "pass-through" wound to the head caused by a large caliber "full metal jacket" bullet. This information was clearly relevant because it tended to show that appellant intended to kill Ms. Gunnet, whom he also shot with a large caliber full metal jacket bullet. It also tended to prove appellant's identity as the killer, a point he disputed at trial. Thus, appellant's claim that the evidence was admitted solely to establish his propensity to commit violent crimes is baseless.

Appellant next asserts that the trial court abused its discretion when it denied his request to have a firearm loaded with blanks and then discharged in the courtroom. Specifically, appellant sought to have the Commonwealth's ballistics expert fire the murder weapon in the darkened courtroom. Appellant argues that this demonstration would have shown that, had he shot Ms. Gunnet at the time that two witnesses alleged, several of the Commonwealth's other witnesses should have seen the muzzle flash.

Experimental evidence, such as that proposed by appellant, is admissible only if the conditions under which the experiment is conducted are substantially similar to those at the time of the event in question. *Commonwealth v. Henry*, 524 Pa. 135, 151, 569 A.2d 929, 936 (1990). As the trial court noted, the interior of a car is a radically different environment from the interior of a courtroom; it would have been difficult, if not impossible, to duplicate the lighting, weather conditions and positions of the witnesses on the morning of the murder merely by turning down the lights in the courtroom. Furthermore, the absence of the demonstration did not prejudice appellant. He was permitted to elicit a great deal of testimony from the expert concerning the size and duration of a

muzzle flash from the alleged murder weapon. This provided more than sufficient grounds for appellant to make the argument that he proposed that the demonstration would have supported. Accordingly, the trial court did not abuse its discretion by denying appellant's request to have a firearm discharged in the courtroom.

Appellant next alleges that the trial court abused its discretion in allowing the trial to continue even though he had not been given certain evidence that supposedly was in the Commonwealth's possession. On April 15, 1996, appellant notified the court that he was in the process of subpoenaing photographs that were taken in Schuylkill County after his arrest. Appellant represented that these "mugshots" were necessary to his defense because they showed that his appearance differed from that of the witnesses' descriptions of the white male they saw near the crime scene on the day of the murder. The trial court ultimately concluded that it would not be necessary to delay the trial until appellant had received these materials. The record indicates that the photographs were provided to appellant by April 17, 1996, approximately midway through the ten-day trial.

Appellant now asserts that he needed these mugshots and "clothing items" that were "seized from the Knight's Inn Motel" in order to cross-examine effectively the Commonwealth's witnesses. Preliminarily, we note that appellant does not describe the "clothing items" to which he is referring. In the record, appellant merely referred to these items as "articles." At that time, the prosecutor indicated that he did not know which items appellant was referring to, and appellant did not elaborate. Because it is impossible for this Court to tell what these items were, whether they existed, and whether appellant ever received them, no reviewable claim is presented with respect to them.

With respect to the mugshots, appellant contends that the Commonwealth violated its discovery obligation. Appellant also asserts that, because several of the eyewitnesses

testified before he had received this evidence, he was deprived of his right to confront them. Neither claim has merit.

The discovery provision invoked by appellant is Pa. R.Crim.P. 305(B)(1)(f), which states:

> (1) *Mandatory.* In all court cases, on request by the defendant, and subject to any protective order which the Commonwealth might obtain under this rule, the Commonwealth shall disclose to the defendant's attorney all of the following requested items or information, *provided they are material to the instant case.* The Commonwealth shall, when applicable, permit the defendant's attorney to inspect and copy or photograph such items . . .
>
> . . .
>
> (f) any tangible objects, including documents, photographs, fingerprints, or other tangible evidence.

*Id.* (emphasis added).[16]

As the trial court properly recognized, there was no discovery violation here. There was no reason for the Commonwealth to suspect that appellant's "mugshots" from another county would be material to this case. Appellant cites no cases, and our research has revealed none, that suggest that "mugshots" pertaining to another case are among the materials that the Commonwealth must automatically retrieve and provide to defendants under Rule 305(b). Further, far from violating any discovery obligation, after appellant belatedly claimed that he needed the photos, the Commonwealth secured and delivered them to appellant during trial.

Appellant's argument that the trial court's ruling deprived him of his right to confront the witnesses against him is also entirely without merit. Appellant was provided with, and availed himself of, the opportunity to cross-examine all of the witnesses who claimed to have seen a white male at the crime scene on the morning of the murder. Further, after he

---

16. In his brief, appellant inadvertently characterizes this as Rule 205; however, his verbatim quotation makes clear that he intends to invoke Rule 305.

secured the photographs, he was free to recall to the stand any relevant witness he pleased, and could confront them with his arrest photograph. That he elected not to do so did not amount to a denial of his right to confront these witnesses.

■ Next, appellant argues that the trial court erred in denying his motion to quash the charges in this case pursuant to the compulsory joinder provision of 18 Pa.C.S. § 110. Appellant alleges that the same factors that made evidence of his prior crimes *relevant* to the trial of this matter also requires a conclusion that the killing here must be viewed as being part of the "same criminal episode" as the prior crimes for purposes of § 110. Specifically, appellant argues that the fact that the three killings occurred within a three day period, and "occurred very closely in terms of geography" (albeit they occurred in different counties), combined with the fact that there was an overlapping of certain witnesses and a single laboratory conducted tests for the various prosecutions, proves that the killings were part of the same criminal episode. We disagree.

■ Section 110 provides in relevant part that:

Although a prosecution is for a violation of a different provision of the statutes than a former prosecution or is based on different facts, it is barred by such former prosecution under the following circumstances:

(1) The former prosecution resulted in an acquittal or in conviction as defined in section 109 of this title (relating to when prosecution is barred by a former prosecution for the same offense) and the subsequent prosecution is for:

. . .

(ii) any offense based on the same conduct or arising from the same criminal episode, if such offense was known to the appropriate prosecuting officer at the time of the commencement of the first trial and was within the jurisdiction of a single court unless the court ordered a separate trial of the charge of such offense.

*Id.* Section 110's compulsory joinder rule was designed to serve two distinct policy considerations: to protect a person accused of crimes from governmental harassment by being forced to undergo successive trials for offenses stemming from the same criminal episode, and to ensure judicial economy. *Commonwealth v. Hude,* 500 Pa. 482, 489, 458 A.2d 177, 180 (1983). Section 110(1)(ii) will only bar a prosecution if: 1) the former prosecution(s) resulted in an acquittal or in a conviction; 2) the instant prosecution is based on the same criminal conduct or arose from the same criminal episode as the former prosecution(s); 3) the prosecutor was aware of the instant charges before the commencement of the trials on the former charges; and 4) the instant charges and the former charges were within the jurisdiction of a single court. *See Commonwealth v. Hockenbury,* 549 Pa. 527, 533, 701 A.2d 1334, 1337 (1997); *Commonwealth v. Bracalielly,* 540 Pa. 460, 472, 658 A.2d 755, 761 (1995). Because we find that the second factor is not present, we need not address the others.

To determine whether various acts constitute a single criminal episode, a court must consider two factors: 1) the logical relationship between the acts, and 2) the temporal relationship between the acts. *Commonwealth v. Bracalielly,* 540 Pa. 460, 472, 658 A.2d 755, 761 (1995). Initially, we reject appellant's suggestion that, merely because certain evidence of appellant's previous crimes was *relevant and admissible* in this prosecution, the crimes must be deemed to be part of the same criminal episode. Other crimes evidence may be admissible, as it was here, for a wide variety of evidentiary purposes; but that fact alone does not prove such a logical connection between the acts so as to constitute a single criminal episode. This is particularly so where, as here, the evidentiary purpose and relevance of the other crimes testimony differs from its use in the previous prosecution. For example, the evidence that appellant shot his brother in Clearfield County was admissible here to, *inter alia,* complete the story and to explain the motive—the need to escape—for the killing here. When evidence of the killing was introduced in the Clearfield County prosecution, however, it was not for

that attenuated point of relevance; instead, it was direct evidence of appellant's guilt for killing his brother.

Although evidence of the previous two killings was certainly relevant here, that fact does not alter the essentially independent nature of the crimes. These were three different homicides, occurring in different counties, on different days, and generating separate criminal investigations in the separate counties. The first killing occurred on January 31, 1995, in Clearfield County, when appellant shot and killed his brother, Dustin Spotz, following a family argument. The second killing occurred a day later, in Schuylkill County, where appellant and Noland had fled after the first killing. In need of an automobile to facilitate their escape, they randomly selected June Ohlinger as their victim, stole her car, robbed her of her jewelry and money, murdered her, and then fled to Rehoboth Beach, Delaware. The murder in this case then occurred only after appellant and Noland had returned to Pennsylvania on February 2, 1995. They proceeded to York County and, fearing that they might be caught and arrested in Ohlinger's car, proceeded to abduct another person whose misfortune it was to randomly venture across their murderous path, Penny Gunnet. After duping Ms. Gunnet into stopping, appellant abducted her at gunpoint, killed her, and then stole her rings, credit cards, and other valuables.

What connects the three killings is not the sort of temporal or logical relationship that requires joinder under § 110. Rather, the common denominator is appellant. But the proof as to each of the killings was largely independent. For example, appellant killed his brother during a heated family argument, during which appellant himself suffered stab wounds. Consistent with the unique circumstances attending the first killing, appellant faced charges in Clearfield County, not of murder, but of manslaughter. That trial focused only on what happened in the family home. The subsequent crimes appellant committed once he fled from Clearfield County had little to do with evaluating that already-completed scenario.

Similarly, the subsequent abductions and killings in Schuylkill and York Counties were confined to those counties, and independent investigations were conducted by local law enforcement officials therein. Although Noland was a key witness in both prosecutions, she was hardly the only witness. For example, in this case, the Commonwealth called numerous witnesses to establish that appellant was seen on Indian Rock Dam Road near the time of the murder. Further, the Commonwealth called Ms. Gunnet's husband and auto mechanic to the witness stand as well as the police officer who investigated the Gunnet crime scene. There was also a great deal of evidence presented relating to the wound to appellant's leg, which helped to prove his guilt here. This evidence was not relevant to the two previous trials. Thus, this is not a case in which the Commonwealth relied solely upon the same witness(es) to prove each of the killings. Instead, the cases generated testimony of different lay and police witnesses as well as the establishment of separate chains of custody. *See Bracalielly*, 540 Pa. at 473–74, 658 A.2d at 762. On such a record, we cannot conclude that there was such a "substantial duplication of issues of law and fact" in the various cases that joinder was required. *See Commonwealth v. Anthony*, 553 Pa. 55, 64, 717 A.2d 1015, 1019 (1998); *Bracalielly*, 540 Pa. at 472, 658 A.2d at 761.

This is not a circumstance similar to that addressed in *Hude* upon which appellant relies. In *Hude*, this Court held that drug charges brought against the defendant were barred by his previous trial on drug charges. But the charges in *Hude* arose out of a series of twenty sales of marijuana to the same individual between October 1974 and January 1975. The Court based its § 110 holding on the fact that different evidence was not required to establish the alleged individual instances of possession and delivery. Rather, the Commonwealth's case rested *solely* on the credibility of the single buyer. *Hude*, 500 Pa. at 482, 458 A.2d at 177. Though committed by the same individual, the killings of separate human beings here cannot be compared to the ongoing, indistinguishable drug sales at issue in *Hude*.

The instant case is far more akin to *Commonwealth v. Bracalielly, supra.* In *Bracalielly,* the defendant sold cocaine to a confidential informant in Allegheny County on two occasions. He also sold cocaine to the same confidential informant in Butler County. This Court held that the Butler County drug sale was not part of the same criminal episode as the two sales in Allegheny County, noting that the Butler County and Allegheny County authorities were each conducting separate undercover investigations of the defendant. Thus, "proof of each individual instance of possession and delivery in each county would not rest solely on the credibility of a single witness, but rather, would require the testimony of completely different police officers and expert witnesses as well as the establishment of separate chains of custody." *Bracalielly,* 540 Pa. at 474, 658 A.2d at 762. In the instant case, there were three victims in three different counties requiring three different investigations, and different witnesses were necessary at each trial. Accordingly, the trial court correctly denied appellant's motion to quash.

▮ Appellant next asserts that the trial court abused its discretion by allowing into evidence a photograph that was intended to display the path of the bullet that struck appellant during the killing of Penny Gunnet. The photograph depicts a woman wearing appellant's pants, sitting in the driver's seat of Ms. Gunnet's vehicle. A metal probe indicates the path of the bullet through the floor of the car, the seat and appellant's pants. The exhibit was introduced during the testimony of Dr. Mihalikis, a forensic pathologist. When asked whether he knew if the probe in the exhibit was placed down through the seat of the car and the hole in the floorboard, Dr. Mihalikis answered, "I believe we did."

We detect no abuse of discretion in admitting the exhibit. The reenactment made use of the physical evidence that was available—*i.e.,* appellant's pants, the floor of the car, and the seat. This was sufficiently based on the admitted evidence so that the re-enactment photograph could assist the jury in assessing the path of the gunshot. Appellant, of course, was not required to accept the demonstration as gospel; he was

536

free to attempt to show that the demonstration was unreliable and, thus, should be rejected by the jury.

■ Furthermore, appellant was not prejudiced by the photograph. In his brief, appellant states that, "the fact that a woman was used sitting in the driver's seat of the car was extremely prejudicial; in light of the gender of the victim." But the woman in the reenactment photo did not represent the victim; rather, she was supposed to represent appellant. Appellant fails to explain how the mere fact that a woman was wearing his pants in a reenactment photo could possibly have prejudiced him.[17]

■ Appellant next alleges that the trial court abused its discretion in allowing Dr. Mihalikis to testify as to Ms. Gunnet's manner of death. Appellant notes that, during the qualification of Dr. Mihalikis, he stated, "the cause of death is my province, what did the person die of. The manner of death is the province of the coroner, and he puts all the facts together, including the autopsies, and consequently certifies the manner of death." Seizing upon this, appellant asserts that Dr. Mihalikis was not qualified to testify as to the manner of death. He further argues that Dr. Mihalikis' opinion as to the manner of death was not stated in terms of a reasonable degree of medical certainty. These arguments are meritless.

■ A witness may testify as an expert provided that he or she possesses "a reasonable pretension to specialized knowledge on the subject matter in question." *Bennett v. Graham*, 552 Pa. 205, 210, 714 A.2d 393, 395 (1998). It is well established in this Commonwealth that expertise can be acquired through occupational experience as well as by scientific study. *Churbuck v. Union Railroad Company*, 380 Pa. 181, 186, 110 A.2d 210, 213 (1955). Here, Dr. Mihalakis testified that he had served as a medical examiner in the state of New

17. Appellant also seems to suggest that it was error for the court to allow the jury to review this exhibit during their deliberations. However, he does not explain why he thinks this is so, nor does he cite any authority in support of his contention. Under Pa.R.Crim.P. 1114, a trial judge may allow the jury to take into deliberations any exhibits he deems proper. We see no error here.

Jersey. In that capacity, it was his responsibility to determine the manner of death in unexpected or unexplained deaths. Further, he testified that he was currently a coroner's pathologist in Pennsylvania. In that capacity, he performed autopsies at the request of the coroner and made determinations as to the manner of death that the coroner would then consider in reaching his own conclusion as to manner of death. In addition, Dr. Mihalikis had been qualified by courts to testify as an expert as to manner of death hundreds of times. The fact that, in Dr. Mihalikis' current job, it was another's "province" to determine the manner of death does not mean that Dr. Mihalikis was *unqualified* to do so. Based upon his experience, Dr. Mihalikis was eminently qualified to testify as an expert as to manner of death.

Appellant's second complaint is equally unavailing. In this jurisdiction, experts are not required to use "magic words." *Commonwealth v. Baez*, 554 Pa. 66, 101, 720 A.2d 711, 728 (1998). Rather, this Court must look to the substance of Dr. Mihalikis's testimony to determine whether his opinions were based on a reasonable degree of medical certainty rather than upon mere speculation. *Id.* In addition to explaining his medical background and training, Dr. Mihalikis explained his conclusions as follows: Ms. Gunnet had been shot once in the neck and once in the chest; the two bullets entered the front of Ms. Gunnet's body and exited through the back of her body; Ms. Gunnet was shot while she was alive, a conclusion based on the amount of hemorrhage surrounding the gunshot wounds; she was run over after she had died, a conclusion based upon the minimal amount of hemorrhage surrounding these wounds; based upon the two bullet holes in the passenger door of Ms. Gunnet's car, the bullets came from the direction of the driver's side of the car; and, based upon the gunshot residue found upon Ms. Gunnet's right hand, her arm was raised in a defensive manner. Dr. Mihalikis clearly explained the medical basis for all of his conclusions. Therefore, it is clear that his opinions were based upon a reasonable degree of medical certainty. Accordingly, the trial court did not abuse its discretion in allowing Dr. Mihalikis to testify

even if he did not intone the "magic words" that appellant claims he was supposed to.[18]

Appellant next asserts that it was error for the court to permit Dr. Mihalikis to testify as a ballistics expert. During direct examination, Dr. Mihalikis testified that the gunshots that killed Ms. Gunnet were fired from within a few inches. Appellant argues that Dr. Mihalikis should not have been permitted to so testify because he later stated that he defers to ballistics experts at times. This argument is unpersuasive.

Dr. Mihalikis testified that, during the course of his career, he has seen hundreds, if not a thousand, gunshot wounds. He has testified concerning ballistics evidence in approximately 50 cases. Further, he stated that he has been qualified as an expert in ballistics in other cases. Accordingly, the trial court did not err in concluding that he possessed a reasonable pretension to specialized knowledge on ballistics. *Bennett,* 552 Pa. at 210, 714 A.2d at 395. Furthermore, appellant cannot possibly show how he was prejudiced by Dr. Mihalikis' testimony. Dr. Mihalikis admitted that he would defer to the greater expertise of a ballistician, and a ballistician did, in fact, testify here. That fact negated any supposed harmful effect of Dr. Mihalikis' testimony.

Appellant next contends that the trial court abused its discretion in allowing two photographs—one depicting Ms. Gunnet's vehicle at the scene of the murder, and another depicting a close-up in which it was possible to see Ms. Gunnet's legs protruding from under the vehicle—into evidence.[19] Appellant does not explain why the trial court erred with respect to the first photo; hence, that claim fails. Appellant argues that the second photo should have been excluded

18. In any event, appellant was certainly not prejudiced by the testimony in question; the manner of death here was indisputable—Ms. Gunnet had been shot in the neck and chest.

19. Appellant mistakenly refers to these exhibits as Commonwealth's Exhibit # 3 and Commonwealth's Exhibit # 4, respectively. Based upon his description however, it is apparent that he is referring to Commonwealth's Exhibit #s 63 and 64.

because the depiction of the victim was inflammatory. We disagree.

A two-part analysis governs whether to admit a photograph of the victim in a homicide trial:

First, a court must determine whether the photograph is inflammatory. If not, it may be admitted if it has relevance and can assist the jury's understanding of the facts. If the photograph is inflammatory, the trial court must decide whether or not the photographs are of such essential evidentiary value that their need clearly outweighs the likelihood of inflaming the minds and passions of the jurors.

*Commonwealth v. Chester*, 526 Pa. 578, 591–92, 587 A.2d 1367, 1373–74 (1991) *cert. denied* 502 U.S. 849, 112 S.Ct. 152, 116 L.Ed.2d 117 (1991). As the trial court properly found, the photo of the victim here was not inflammatory. Although Ms. Gunnet's calves and feet are visible protruding from under the vehicle where appellant left her, there is neither blood nor a wound visible. Furthermore, since the photograph depicts the crime scene and shows the angle of the vehicle, it was relevant to the jury's understanding of how the crime scene appeared on the day of the murder. The trial judge did not abuse his discretion in permitting the photograph into evidence.

Appellant next alleges that the trial court abused its discretion by prohibiting the testimony of proposed defense witness Lawrence "Pete" Shugars. During the colloquy on the defense proffer, Shugars informed the court that he had testified on behalf of appellant in Schuylkill County prior to being sentenced in an unrelated case. Shugars told the court that he believed that he had received a stiffer sentence because of that testimony and, accordingly, would invoke his Fifth Amendment right against self-incrimination rather than testify on behalf of appellant here. Appellant then sought to have Shugars' prior testimony admitted. In Schuylkill County, Shugars had testified that, while he was in the same prison with Christina Noland, he was notified by third persons that Noland wished to write to him. He later allegedly received a letter that bore Noland's name, in which the author made

reference to having shot someone. Shugars did not save the letter. The trial court ultimately ruled that Shugars could not testify and that his prior testimony was inadmissible because it was unreliable and lacked a proper foundation.

There was no error here. As Shugars informed the court, he did not know Noland's handwriting. The *only* reason he had to believe that she was the author of the letter was that it bore her name. He further testified that, although he had spoken to Noland in a holding cell, she never expressed an intention to write to him. Instead, he was informed that Noland wanted to write to him by a third party. Appellant has failed to show, both in the trial court and here, why he thinks Shugars' testimony, which would have characterized the out-of-court letter, was admissible. The letter itself certainly would not be admissible into evidence. *See Commonwealth v. Brooks*, 352 Pa.Super. 394, 398, 508 A.2d 316, 318 (1986) (letters may be authenticated by direct proof such as testimony of witness who saw author sign document, acknowledgement of execution by signer, admission of authenticity by adverse party or proof that document is in the purported author's handwriting, or by circumstantial evidence.) Since the no-longer-existing letter would be inadmissible, there is no basis to admit Shugars' prior testimony characterizing it.[20]

■ Appellant next asserts that the evidence adduced at trial was insufficient to establish that he was guilty beyond a reasonable doubt of conspiracy to commit first degree murder, kidnapping and robbery of a motor vehicle. Appellant asserts that, because Noland testified that she only stayed with appellant because he threatened her, she could not have conspired with him to commit these crimes. Appellant's argument lacks merit.

■ A conspiracy conviction requires proof of (1) an intent to commit or aid in an unlawful act, (2) an agreement

---

**20.** Appellant also asserts that the trial court erred because it failed to ask certain additional questions of Shugars that might have created a proper foundation for admitting his testimony. But the trial court was not obliged to act as appellant's counsel. If appellant wanted different questions to be asked, he should have requested them.

with a co-conspirator and (3) an overt act in furtherance of the conspiracy. *Commonwealth v. Spotz, supra,* 552 Pa. at 523, 716 A.2d at 592. Because it is difficult to prove an explicit or formal agreement to commit an unlawful act, such an act may be proved inferentially by circumstantial evidence, *i.e.*, the relations, conduct or circumstances of the parties or overt acts on the part of the co-conspirators. *Id.* at 524, 716 A.2d at 592.

At trial, Noland testified that she and appellant were in York County in search of a car and money to further their escape from authorities who were seeking them in connection with the previous crimes. Subsequently, appellant approached Ms. Gunnet's vehicle on the pretense of asking her for directions. After appellant forced Ms. Gunnet into the passenger seat, Noland moved into the driver's seat of June Ohlinger's vehicle. She turned the car around while appellant waited for her to do so, and then followed him to a remote country road where he executed Ms. Gunnet. Noland explicitly testified that she believed that appellant was going to "hurt [Gunnet] like he did Mrs. Ohlinger" (NT, 4/13/96, at 258). Whether Noland feared appellant or not, this evidence amply showed her active role in the conspiracy to steal Gunnet's car, kidnap her, and murder her to prevent their capture. As the trial court noted, "the conspiracy was proven when Nolan[d] testified to her prior knowledge of the defendant's criminal intent and her voluntary association and support of his intentions." Trial Court Opinion at 16. Thus, the evidence was sufficient to support the guilty verdict for conspiracy.

■ Appellant next asserts that the prosecutor committed misconduct when, after being ordered not to, he continued to refer to the robbery of Ms. Gunnet's vehicle as a "car-jacking." The trial court rejected the claim in its post-verdict opinion, finding, *inter alia,* that the references did not render the jury incapable of fairly weighing the evidence.

■ The decision whether to grant a new trial because of alleged prosecutorial misconduct rests within the discretion of the trial court and will not be disturbed on appeal absent an abuse of discretion. *Commonwealth v. Rios,* 554 Pa. 419, 429–

30, 721 A.2d 1049, 1054 (1998). Comments by a prosecutor do not constitute reversible error unless the language was such that its unavoidable effect was to prejudice the jury, forming in their minds fixed bias or hostility towards the defendant, so that they could not weigh the evidence objectively and render a true verdict. *Id.* The trial court did not abuse its discretion in rejecting the misconduct claim raised here.

During voir dire, the prosecutor referred to the charge of robbery of a motor vehicle, *see* 18 Pa.C.S. § 903, as "car-jacking." There was an objection that was not, it appears from the record, then ruled upon. A short time later, the prosecutor again made a reference to "car-jacking." At that time, the trial court instructed the prosecutor to refrain from using that term.

After he was cautioned against using the word during voir dire, the prosecutor refrained from using the word throughout the course of the trial. During closing argument, however, he made three brief references to the robbery of Ms. Gunnet's vehicle as a "car-jack." Appellant did not object to any of the references, nor did the trial court *sua sponte* interrupt the prosecutor.[21]

We agree with the trial court that use of the colloquial term "car-jack", rather than the formal statutory term robbery of a motor vehicle, did not destroy the jury's ability to be fair. It is difficult to see how the term "car-jack" carries with it a connotation that is any more negative or prejudicial than the statutory term. Both terms describe the taking of a motor vehicle by force. There is nothing inherently prejudicial in the colloquial phrase. Indeed, both this Court and the Superior Court have used the term "car-jacking" in published opinions. *See Commonwealth v. Romero*, 555 Pa. 4, 722 A.2d 1014, 1021 (1999); *Commonwealth v. George*, 705 A.2d 916, 919 (Pa.Super.1998). Finally, we note that the federal offense that

21. Since the trial court admonished the prosecutor in response to the only objection appellant raised, appellant's claim of misconduct is waived. Nevertheless, we will reach the issue as this is a direct appeal in a capital case. *Commonwealth v. Zettlemoyer*, 500 Pa. at 26 n. 3, 454 A.2d at 942 n. 3.

is the equivalent of this statute has routinely been referred to as "car-jacking" by the courts interpreting it, notwithstanding that that term does not appear in the statute itself. *See United States v. Bishop*, 66 F.3d 569 (3d Cir.1995), *cert. denied*, 516 U.S. 1066, 116 S.Ct. 750, 133 L.Ed.2d 698 (1996); *United States v. Romero*, 122 F.3d 1334 (10th Cir.1997), *cert. denied*, 523 U.S. 1025, 118 S.Ct. 1310, 140 L.Ed.2d 474 (1998). A term of such common acceptance, accurately describing the essence of the statute, can hardly have prejudiced the jury to the point that it could not weigh the evidence.

▮▮▮ Appellant's last claim is that the prosecutor committed misconduct during his penalty phase closing argument by supposedly quoting from the Bible.[22] During closing argument, appellant's counsel argued, *inter alia*, that appellant had endured a troubled childhood and that that circumstance should be deemed a mitigating circumstance. In response to the argument, the prosecutor stated:

> Did Mark Spotz have a troubled childhood? I don't know that—I don't know that the Commonwealth would dispute that fact. But long before Dustin Spotz was killed and June Ohlinger and Penny Gunnet were murdered, Mark Spotz became a man and put away childish things.

N.T., 4/24/96 at 371.

Petitioner alleges that the prosecutor's responsive argument was a direct reference to 1 *Corinthians* 13:11, where St. Paul writes, "when I was a child, I talked like a child, I thought like a child, I reasoned like a child. When I became a man, I put childish ways behind me." Appellant argues that, based upon this Court's holdings in *Commonwealth v. Chambers*, 528 Pa. 558, 599 A.2d 630 (1991) and *Commonwealth v. Brown*, 551 Pa. 465, 711 A.2d 444 (1998), the prosecutor's unobjected-to reference was *per se* impermissible, and his death sentence must be vacated. We disagree.

---

**22.** This issue was not raised at trial and, thus, is waived. Nevertheless, we will review the claim on the merits. *See Commonwealth v. Zettlemoyer, supra.*

First, it is not clear that the prosecutor was invoking the Bible. He certainly never mentioned the Bible by name, nor did he otherwise suggest that he was invoking the Bible. This is in sharp contrast to *Chambers,* where the reference was explicit, *see* 528 Pa. at 585, 599 A.2d at 643 (prosecutor argued, "as the Bible says 'and the murderer shall be put to death' ") or *Brown,* where the reference was very thinly veiled, *see Brown,* 551 Pa. at 493, 711 A.2d at 457 (in case where defendant was convicted of killing a three-year-old child, prosecutor stated, "there is a page in that book, it says, it is better that you had a millstone tied around your neck and be cast into the deep, than that you harm a child. This is ancient law....").[23]

Here, the prosecutor's statement merely had five words in common with the passage from Corinthians. Furthermore, even if the phrase employed by the prosecutor could be said to have a biblical origin, we cannot say that this phrase was so distinctive that the jury must have believed that a religious document was being invoked. Much of our everyday speech and idiomatic expressions can be traced to biblical sources. To ban all such phrases based upon their etymology might ultimately operate to ban most speech, or certainly most speech concerning moral matters such as criminal responsibility.

More importantly, the impropriety that *Chambers* and *Brown* sought to eradicate was the invocation of biblical or religious authority *in support of* a death penalty verdict. As we explained in *Chambers:* "this argument [that the Bible supports the imposition of the death penalty] advocates to the

**23.** We noted in *Brown* that the language employed by the prosecution was distinctive; indeed, it could be found in each of the three synoptic gospels. *See* Matthew 18:6 ("But whoso shall offend one of these little ones which believe in me, it were better for him that a millstone were hanged around his neck, and that he were drowned in the depth of the sea"); Mark 9:42 ("And whosoever shall offend one of these little ones that believe in me, it is better for him that a millstone were hanged about his neck, and he were cast into the sea"); Luke 17:2 ("It were better for him that a millstone were hanged about his neck, and he cast into the sea, than that he should offend one of these little ones"). From the distinctive language and the reference to "that book," it was clear that the prosecutor was invoking the New Testament.

jury that an independent source of law exists for the conclusion that the death penalty is the appropriate punishment for [a defendant].... If a penalty of death is meted out by a jury, it must be because the jury was satisfied that the substantive law of the Commonwealth requires its imposition, not because of some other source of law." *Chambers*, 528 Pa. at 586–87, 599 A.2d at 644; *cf. Carruthers v. State*, 272 Ga. 306, 528 S.E.2d 217 (2000). We reiterated this point more recently in *Brown:* "*[r]eliance* upon the Bible in any manner during a closing argument during the penalty phase is reversible error per se pursuant to *Chambers.*" *Brown*, 551 Pa. at 493, 711 A.2d at 457 (emphasis added).

Here, the prosecutor made the alleged biblical reference as he was explaining to the jury that appellant was no longer a child and, therefore, his alleged troubled childhood could not excuse his conduct. The prosecutor did not remotely suggest that there was a biblical basis, independent of Pennsylvania law, for sentencing appellant to death. Accordingly, the prosecutor did not violate the holdings in *Chambers* and *Brown.*[24]

Finally, pursuant to 42 Pa.C.S. § 9711(h)(3), our careful review of the record convinces us that the sentence imposed was not the product of passion, prejudice or any other arbitrary factor. Further, we find that the evidence was sufficient to establish the aggravating circumstances found by the jury, *i.e.*, that appellant killed Ms. Gunnet during the perpetration of a felony, 42 Pa.C.S. § 9711(d)(6); that he had a significant history of felony convictions involving the use of violence, *id.* § 9711(d)(9); that he had been convicted of another offense before the time of the offense at issue for which a sentence of

24. Appellant cites *Brown* as prohibiting reliance upon the Bible in any manner during a penalty phase closing. *Brown*, of course, was merely applying *Chambers*. The "reliance" prohibited by the cases—a reliance explicitly invoked by the prosecutor in those two cases—is a reliance upon the Bible as a source, independent of Pennsylvania law, for returning a verdict of death. Moreover, we note that *Brown* was decided two years after the trial here. The prosecutor did not commit misconduct by making an argument that was not at the time disapproved by this Court. No doubt, that is why appellant failed to object to the innocuous reference, if he even recognized its origin in the first place.

death was possible, *id.* § 9711(d)(10); and, that he had been convicted of another murder before the time of the offense. *Id.* § 9711(d)(11).

 Moreover, in accordance with *Zettlemoyer*, 500 Pa. at 26, 454 A.2d at 942, we must conduct a proportionality review as to appellant's sentence of death.[25] Here, since the jury found that the four aggravating circumstances outweighed the two mitigating circumstances, the jury was statutorily required to impose a sentence of death. 42 Pa.C.S. § 9711(c)(1)(iv). Further, we have conducted an independent review of similar cases and reviewed the data compiled by the Administrative Office of Pennsylvania Courts in which the sentence of death was made mandatory by the finding of aggravating factors that outweighed mitigating circumstances and conclude that the sentence of death imposed upon appellant is not disproportionate to the sentences imposed in similar cases. Accordingly, we affirm the verdict and the sentence of death imposed upon appellant by the Court of Common Pleas of York County.[26]

Judgment of sentence affirmed.

Justice ZAPPALA concurs in the result.

**25.** Effective June 25, 1997, the General Assembly repealed 42 Pa.C.S. § 9711(3)(h)(iii), pursuant to which this review was required. However, we continue to review for proportionality all cases on direct appeal in which the sentence of death was imposed prior to that date. *See Commonwealth v. Gribble,* 550 Pa. 62, 703 A.2d 426 (1997), *cert. denied,* 525 U.S. 1005, 119 S.Ct. 519, 142 L.Ed.2d 430 (1998) (Act 28 does not apply retroactively).

**26.** The Prothonotary of this Court is directed to transmit to the Governor's office a full and complete record of the trial, sentencing hearing, imposition of sentence and review by the Supreme Court pursuant to 42 Pa.C.S. § 9711(i).