J-S50029-17

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | |
|---|---|
| COMMONWEALTH OF PENNSYLVANIA | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| Appellant | |
| v. | |
| JULIAN ABRON | |
| Appellee | No. 684 EDA 2016 |

Appeal from the Order February 5, 2016
In the Court of Common Pleas of Philadelphia County
Criminal Division at No(s): CP-51-CR-0010497-2013

BEFORE: PANELLA, J., MOULTON, J., and RANSOM, J.

MEMORANDUM BY MOULTON, J.: **FILED OCTOBER 30, 2017**

The Commonwealth of Pennsylvania appeals from the February 5, 2016 order purporting to acquit Julian Abron of all charges upon which he had been convicted following a non-jury trial. Because the trial court lacked authority to acquit Abron after having entered a verdict of guilty that was supported by sufficient evidence, we vacate and remand for further proceedings.

This case involved the alleged intimidation of an assault victim by Abron and others, including his co-defendant, Mark Easley. The trial court set forth a detailed factual history, which we adopt and incorporate herein. *See* Opinion, 8/11/16, at 2-11 ("1925(a) Op.").

On February 5, 2016, the trial court conducted a non-jury trial. At the conclusion of the trial, after hearing argument from counsel for both

defendants and the Commonwealth, the trial court made the following statement on the record:

> I don't think there's enough for VUFA, so that's out. However, based on the entirety of the evidence, there is enough for retaliation and the intimidation charges, charges three and four and one, which was conspiracy for those charges.[1]

N.T., 2/5/16, at 127. After discussing sentencing and possible bail revocation,[2] the trial court excused the parties and called a brief recess. *Id.* at 129.

Following the recess,[3] the trial court returned to the bench and stated:

---

[1] 18 Pa.C.S. §§ 4952(a)(1), 4953(a), and 903(a), respectively. We note that while the trial court did not use the term "guilty" in its findings, all parties appear to agree that the trial court found Abron guilty of the aforementioned charges.

[2] The docket entry for the verdicts indicates that after the court found Abron guilty, it then: (1) ordered a presentence investigation; (2) heard an oral motion from the Commonwealth to revoke bail, which it denied; (3) heard an oral motion from Abron to reconsider adjudication, which it granted; (4) found Abron not guilty on all charges; and (5) vacated Abron's electronic monitoring and cancelled sentencing.

[3] In its motion for reconsideration, the Commonwealth averred that, after denying the Commonwealth's motion to revoke bail, the trial court ordered a "staggered release" so the victim, Maneia Singleton and her Mother could leave before Abron. The Commonwealth claims that Singleton and her Mother asked to address the court before leaving, stating "how they felt they were mistreated by the Philadelphia Police Department and the Philadelphia District Attorney's Office." Cmwlth.'s Mt. to Reconsider Am. Verdict, 2/18/16, at 3. According to the Commonwealth, the trial court then called Abron back into the courtroom, called the attorneys to sidebar, and stated that it had reconsidered its verdict. *Id.* Based on the transcript of proceedings, we cannot determine whether the court's discussion with
*(Footnote Continued Next Page)*

> THE COURT: Step up Mr. Abron. The Court is reconsidering its decision in the matter of Julian Abron. The court has reasonable doubt as to the identification of this defendant alone because of the description given by the complaining witness in the grand jury investigation notes during at which time [sic] she said that he was light skinned. Clearly, he is not light skinned today nor was he in the picture or photo, nor was he ever light skinned. I can see that with my own eyes. Not guilty on this matter.
>
> THE COMMONWEALTH: Please just note the Commonwealth's objection for the record.
>
> THE COURT: Yes.

*Id.*

On February 18, 2016, the Commonwealth filed a motion to reconsider, which the trial court denied without a hearing on February 19, 2016. On March 2, 2016, the Commonwealth timely filed a notice of appeal.

The Commonwealth raises one issue on appeal: "Did the trial court err in arresting judgment and vacating the guilty verdict where the evidence was legally sufficient to prove intimidation of a witness, retaliation against a witness, and criminal conspiracy?" Cmwlth.'s Br. at 2.

The Commonwealth first argues that the trial court lacked the authority to reconsider and vacate Abron's verdict *sua sponte*.[4] The

*(Footnote Continued)* _____

Singleton and her mother occurred before or after the court announced that it had reconsidered its verdict.

[4] Abron argues that the Commonwealth has waived this argument because it failed to include it in its Pennsylvania Rule of Appellate Procedure 1925(b) statement. However, the trial court never ordered the Commonwealth to file a Rule 1925(b) statement. Because "[t]he requirements of Rule 1925(b) are not invoked in cases where there is no

*(Footnote Continued Next Page)*

Commonwealth contends that "a trial court has no more authority over a verdict in a non-jury trial than it does over a jury verdict" and, therefore, the trial court erred in vacating Abron's convictions *sua sponte*. Cmwlth.'s Br. at 8-9. In addition, the Commonwealth asserts that, even if the trial court could address the sufficiency of the evidence *sua sponte*, the trial court erred because its decision was based on the weight, rather than the sufficiency, of the evidence. Finally, the Commonwealth argues that, in any event, the evidence was sufficient to sustain Abron's conviction.

Abron responds that the trial court's decision was not *sua sponte* but instead was based on an oral motion. Abron further contends that "the trial court properly granted an arrest of judgment because the identification evidence was insufficient to establish beyond a reasonable doubt that . . . Abron[] was one of the individuals involved in the . . . incident." Abron's Br. at 13. According to Abron, the trial court did not re-evaluate "the testimony presented or alter[] its determination of witness credibility to arrive at a not guilty verdict," but instead determined that the identification of Abron by the victim, Maneia Singleton, was insufficient to sustain the conviction. **Id.**

_(Footnote Continued)_ ───────────

trial court order directing an appellant to file a Rule 1925(b) statement[,]" we will not conduct a waiver analysis. **Commonwealth v. Antidormi**, 84 A.3d 736, 745 n.7 (Pa.Super. 2014); **see also Commonwealth v. Thomas**, 451 A.2d 470, 472 n.8 (Pa.Super. 1982) ("[T]he lower court must order a concise statement of [errors] complained of on appeal and an appellant must fail to comply with such directive before this Court can find waiver . . . .").

Abron asserts that a trial judge may grant an arrest of judgment where the trial court determines that the evidence was insufficient.

Preliminarily, we must attempt to determine the basis for the trial court's decision. A trial court has the authority to consider sufficiency post verdict, even if it was the fact-finder and even in the absence of a motion. **See Commonwealth v. Stark**, 584 A.2d 289, 291 (Pa. 1990). Once it enters a guilty verdict, however, it may not *sua sponte* reconsider the weight of the evidence.[5] **See Commonwealth v. Robinson**, 33 A.3d 89, 94 (Pa.Super. 2011). Not surprisingly, Abron and the trial court characterize the court's decision as an arrest of judgment based on insufficient evidence to sustain Abron's convictions. The Commonwealth, in contrast, points to language in the trial court's opinion that appears to focus on weight and credibility. **See** Cmwlth.'s Br. at 12-13.

Unfortunately, neither the transcript of proceedings nor the trial court's Pennsylvania Rule of Appellate Procedure 1925(a) opinion makes clear whether the court's decision was based on weight or sufficiency. The opinion concludes that "all reasonable inferences deduced from the evidence were **insufficient** to establish all the elements of the offenses beyond a reasonable doubt." 1925(a) Op. at 15 (emphasis added). In contrast, the opinion also states that because "[i]t was within the exclusive province of

_____

[5] This is not to say that Abron could not file a post-verdict motion challenging the weight of the evidence.

- 5 -

the trial court as fact-finder to **resolve conflicts in the testimony** and to believe all, part, or none of the evidence," the court "did not abuse its discretion in arresting the judgment and **vacating the guilty verdict on the weight of the evidence**." 1925(a) Op. at 12 (emphasis added). The trial court focused on Singleton's credibility, concluding that "there was insufficient evidence to satisfy a guilty verdict because [Singleton]'s testimony was largely inconclusive as she was unable to identify [Abron] and her memory was unreliable."[6] *Id.* at 13. In addition, the trial court stated that the "police officer['s] testimony was unreliable and inconsistent" and took issue with the show-up identification of Abron. *Id.* at 15. Because the trial court was not clear about whether it was arresting judgment based on insufficiency or weight of the evidence, we are constrained to examine each possibility in turn.

We first examine whether the trial court could have properly arrested judgment based on insufficiency of the evidence. Our standard of review for a sufficiency of the evidence claim is as follows:

> We must determine whether the evidence admitted at trial, and all reasonable inferences drawn therefrom, when viewed in a light most favorable to the Commonwealth as verdict winner, support the conviction beyond a reasonable doubt. Where there is sufficient evidence to enable the trier of fact to find every element of the crime has been

_____

[6] The standard of review set forth in the trial court's opinion addresses standards for both sufficiency and weight of the evidence. *See* 1925(a) Op. at 11-12.

established beyond a reasonable doubt, the sufficiency of the evidence claim must fail.

The evidence established at trial need not preclude every possibility of innocence and the fact-finder is free to believe all, part, or none of the evidence presented. It is not within the province of this Court to re-weigh the evidence and substitute our judgment for that of the fact-finder. The Commonwealth's burden may be met by wholly circumstantial evidence and any doubt about the defendant's guilt is to be resolved by the fact[-]finder unless the evidence is so weak and inconclusive that, as a matter of law, no probability of fact can be drawn from the combined circumstances.

***Commonwealth v. Rodriguez***, 141 A.3d 523, 525 (Pa.Super. 2016)

(quoting ***Commonwealth v. Tarrach***, 42 A.3d 342, 345 (Pa.Super. 2012)).

A person may be convicted of intimidating a witness or victim if

with the intent to or with the knowledge that his conduct will obstruct, impede, impair, prevent or interfere with the administration of criminal justice, he intimidates or attempts to intimidate any witness or victim to:

(1)   Refrain from informing or reporting to any law enforcement officer, prosecuting official or judge concerning any information, document or thing relating to the commission of a crime.

18 Pa.C.S. § 4952(a)(1).  Additionally, we note that

[a]ctual intimidation of a witness is not an essential element of the crime. The crime is committed if one, with the necessary mens rea, "*attempts*" to intimidate a witness or victim. . . . The trier of the facts, therefore, could find that appellant attempted to intimidate his accuser and that he did so intending or, at least, having knowledge that his conduct was likely to, impede, impair or interfere with the administration of criminal justice. . . . The Commonwealth is not required to prove *mens rea* by direct evidence. Frequently, such evidence is not available. In such cases, the Commonwealth may rely on circumstantial evidence.

- 7 -

***Commonwealth v. Beasley***, 138 A.3d 39, 48 (Pa.Super.) (quoting ***Commonwealth v. Collington***, 615 A.2d 769, 770 (Pa. Super. 1992)) (emphasis in original), *app. denied*, 161 A.3d 791 (Pa. 2016).

A person may be convicted of retaliation against a witness or victim "if he harms another by any unlawful act or engages in a course of conduct or repeatedly commits acts which threaten another in retaliation for anything lawfully done in the capacity of witness, victim or a party in a civil matter." 18 Pa.C.S. § 4953(a).

A person may be convicted "of conspiracy with another person . . . to commit a crime if with the intent of promoting or facilitating its commission he . . . agrees with such other person . . . that they or one or more of them will engage in conduct which constitutes such crime or an attempt or solicitation to commit such crime . . . ." 18 Pa.C.S. § 903. Thus, to sustain a conspiracy conviction, the Commonwealth must prove "(1) an intent to commit or aid in an unlawful act, (2) an agreement with a co-conspirator[,] and (3) an overt act in furtherance of the conspiracy." ***Commonwealth v. Spotz***, 756 A.2d 1139, 1162 (Pa. 2000). "Because it is difficult to prove an explicit or formal agreement to commit an unlawful act, such an act may be proved inferentially by circumstantial evidence, *i.e.*, the relations, conduct or circumstances of the parties or overt acts on the part of the co-conspirators." ***Id.***

Viewing the evidence in the light most favorable to the Commonwealth, we conclude that the evidence was sufficient to convict

Abron of the aforementioned offenses. Singleton's prior statements, first to police and then to the grand jury, were admitted as substantive evidence under Pennsylvania Rule of Evidence 803.1. In those statements, Singleton stated that, after reporting an assault to the police, Abron and his co-defendant drove up to Singleton's home—Singleton remembered the color and license plate of the vehicle. Cmwlth.'s Reproduced Record at 57, 78.[7] Singleton stated that when they exited the vehicle, she saw that one of them had a gun, which he then placed in the trunk. *Id.* at 58-59, 78. Singleton also stated that both men admonished Singleton and her fiancé for "snitching." *Id.* at 58, 78. After Singleton reported this incident to the police, the men returned, again calling Singleton and her fiancé "snitches" and challenging her fiancé to a fight. *Id.* at 59-60, 78. Singleton also testified that one of the men brandished a gun, grabbing at the weapon while it was tucked into his waistband. *Id.* at 61, 79. Later that day when police stopped the vehicle, Singleton identified Abron, his co-defendant, and the vehicle. *Id.* at 63, 79. Because these identifications confirmed Abron as one of the men who intimidated and threatened her and her fiancé, we conclude that, despite the trial court's post-verdict decision to discredit Singleton's earlier statements, the evidence was sufficient to convict Abron.

_____

[7] The police statement and grand jury testimony were not submitted as part of the certified record, but were admitted as exhibits at trial. Accordingly, we cite the Commonwealth's reproduced record.

*See Commonwealth v. Orr*, 38 A.3d 868, 874-75 (Pa.Super. 2011) (concluding that victim's out-of-court identification, along with other circumstantial evidence, was sufficient to convict appellant).

The possibility remains, however, that the trial court's ruling was based on weight, not sufficiency. Despite citing case law relating to sufficiency, the trial court appears to have based its decision largely on its post-verdict assessment of Singleton's credibility. An issue "[d]irected entirely to the credibility of the Commonwealth's chief witness . . . challenges the weight, not the sufficiency, of the evidence." *Commonwealth v. Palo*, 24 A.3d 1050, 1054 (Pa.Super. 2011). However, a trial court lacks the authority to vacate a guilty verdict based on the weight of the evidence in the absence of a defense motion. *See Commonwealth v. Robinson*, 33 A.3d 89, 94 (Pa.Super. 2011).

Our decision in *Robinson* is instructive. There, following a non-jury trial, the trial court found Robinson guilty of theft by unlawful taking, sentenced Robinson to 18 months' probation, but deferred restitution to allow "the Commonwealth to obtain accurate figures on the value of the stolen items." *Id.* at 91. When the trial court convened a restitution hearing, "instead of determining restitution, the trial court *sua sponte* vacated [Robinson]'s judgment of sentence and entered a verdict of not guilty. . . . because it had failed to give due consideration to the weight of [Robinson]'s character evidence." *Id.* (quotation omitted).

We reversed, reinstated the verdict and judgment of sentence, and remanded for a restitution determination. After determining that the trial court acted *sua sponte* because no oral motion for an arrest of judgment appeared of record, we concluded that the trial court lacked the authority to modify the verdict because

> [a] post-verdict court may not reweigh the evidence and change its mind as the trial court did herein. Although a post-verdict judge may question a verdict, his discretionary powers are limited to a determination of whether the evidence was sufficient to uphold the original verdict, and he may not alter the original verdict and substitute a new one. The trial court's verdict must be accorded the same legal effect as a jury verdict. Post-trial, the court cannot re-deliberate as it is no longer the fact[-]finder. Just as jurors are not permitted to testify as to the mental processes that led to their verdict, so is the trial court precluded from testifying as to its flawed thought process as a fact[-]finder.

*Id.* at 94 (internal citations omitted); *see Commonwealth v. Parker*, 451 A.2d 767, 769-70 (Pa.Super. 1982) (concluding that trial court exceeded its authority in reconsidering facts and *sua sponte* changing verdict to not guilty).

Unfortunately, here again, the record is unclear. Both Abron and the trial court contend that Abron made an oral motion for reconsideration of the evidence. The Commonwealth, rather than affirmatively asserting that no such motion was made, instead contends that no such motion appears in the record. Based on our review, the only reference in the record to such a motion is the docket entry for the verdicts in this case.

Even if Abron made the motion and the trial court granted the motion based on the weight of the evidence, the trial court erred in granting Abron a discharge. It is well settled that where a trial court concludes that the verdict was against the weight of the evidence, the proper relief is a new trial. *See Commonwealth v. Brown*, 648 A.2d 1177, 1189 (Pa. 1994) ("A trial court will grant a new trial when it believes the verdict was against the weight of the evidence and resulted in a miscarriage of justice.") (quotation omitted). Accordingly, under these circumstances, if the trial court found that the verdict was against the weight of the evidence, the proper remedy was to grant Abron a new trial.

If, however, Abron did not make the motion, then trial court *sua sponte* reweighed the evidence and exceeded its authority because absent a post-verdict motion challenging the weight of the evidence, "[a] post-verdict court may not reweigh the evidence." *Robinson*, 33 A.3d at 94.

Because we cannot determine whether a motion for reconsideration was properly before the court, we remand this matter for further proceedings. If the trial court determines that Abron moved the trial court for reconsideration because the verdict was against the weight of the evidence, then the trial court may reweigh the evidence and determine whether Abron should receive a new trial.[8] However, if the trial court

_____

[8] Given the state of the record, and the failure of the parties to address this issue on appeal, we do not address at this time whether a
*(Footnote Continued Next Page)*

- 12 -

determines that Abron did not move for reconsideration, then it improperly re-weighed the evidence following a finding of guilt because it lacked the authority to *sua sponte* change the verdicts. Under those circumstances, the trial court's order changing the verdicts was a legal nullity, **see Commonwealth v. Stark**, 584 A.2d 289, 291 (Pa. 1990), and the trial court should reinstate the original verdicts and schedule sentencing.

Order vacated. Case remanded for further proceedings consistent with this memorandum. Jurisdiction relinquished.

Judgment Entered.

_____
Joseph D. Seletyn, Esq.
Prothonotary


Date: 10/30/2017

---

*(Footnote Continued)* ————————————

determination that the verdicts were against the weight of the evidence would be an abuse of discretion. **See Commonwealth v. Widmer**, 744 A.2d 745, 751-52 (Pa. 2000).

IN THE COURT OF COMMON PLEAS OF PHILADELPHIA COUNTY
FIRST JUDICIAL DISTRICT OF PENNSYLVANIA
CRIMINAL TRIAL DIVISION

| | | |
|---|---|---|
| COMMONWEALTH OF PENNSYLVANIA | : | CP-51-CR-0010497-2013 |
| | : | |
| v. | : | |
| | : | SUPERIOR COURT |
| JULIAN ABRON | : | NO. 684 EDA 2016 |

### OPINION

THOMAS STREET, J.                                                August 11, 2016

## I.    OVERVIEW AND PROCEDURAL HISTORY

The Defendant, Julian Abron, was arrested and charged with Conspiracy- Intimidation of a Witness or Victim- Refrain From Report (F3),[1] Possession of a Firearm Prohibited (F2),[2] Retaliation Against a Witness or Victim (F3),[3] Intimidation of a Witness or Victim- Refrain From Report (F3),[4] Firearms Not to be Carried Without a License (F3),[5] Carry Firearms on the Public Streets in Philadelphia (M1),[6] Terroristic Threats With Intent to Terrorize Another (M1),[7] and Possession of an Instrument of Crime with Intent (M1)[8] on July 17, 2013, in the area of 2100 block of Gould Street, Philadelphia, Pennsylvania. On September 11, 2013, the Defendant filed an omnibus pre-trial motion. On October 3, 2014 and November 24, 2014, the Defendant filed a Motion to Dismiss pursuant to Rule 600.

[1] 18 Pa.C.S. § 903 §§ C
[2] 18 Pa.C.S. § 6105 §§ A1
[3] 18 Pa.C.S. § 4953 §§ A
[4] 18 Pa.C.S. § 4952 §§ A1
[5] 18 Pa.C.S. § 6106 §§ A1
[6] 18 Pa.C.S. § 6108
[7] 18 Pa.C.S. § 2706 §§ A1
[8] 18 Pa.C.S. § 907 §§ A



CP-51-CR-0010497-2013 Comm. v. Abron, Julian
Opinion



7484651681



FILED

AUG 1 1 2016

Criminal Appeals Unit
First Judicial District of PA

On February 23, 2015, this court held a motions hearing and denied the Defendant's Rule 600(b) Motion. On July 21, 2015, this court granted the motion and released the Defendant to house arrest with electronic monitoring. On February 4, 2016, the Defendant filed another Motion to Dismiss pursuant to Rule 600(a). On February 5, 2016, this court held a motions hearing and denied the Defendant's Motion to Dismiss. On the same day, a non-jury trial was held at which the Defendant was found guilty of Retaliation Against a Witness, Criminal Conspiracy, and Intimidation of Witness only and not guilty as to the remaining charges. A pre-sentence investigation was ordered. On the same day, the court heard and denied the Commonwealth's oral Motion for Bail Revocation. This court also heard and granted an oral Defense Motion for Reconsideration of Adjudication vacating its earlier finding. The Defendant was ultimately found not guilty of all charges and house arrest/electronic monitoring was vacated and the sentencing date cancelled.

On February 18, 2016, the Commonwealth filed a Motion to Reconsider. On February 19, 2016, this court denied the Commonwealth's Motion for Reconsideration without a hearing. On March 2, 2016, the Commonwealth filed a Notice of Appeal and a Concise Statement of Matters Complained of on Appeal.

## II.     FACTUAL HISTORY

Ms. Maneia Singleton testified that on July 17, 2013, the incident in question occurred at her address on the block of 2100 South Gould Street, Philadelphia, Pennsylvania.[9] (N.T. 2/5/16 pp. 42, 46). She stated she did not remember everything that occurred that day. "I know why I'm here but I really don't know everything that went on that day." (N.T. 2/5/16 p. 42). Ms. Singleton further stated, "I have a medical condition. I have a bad heart and bad lungs." (N.T. 2/5/16 pp. 42-

---

[9] References to the record refer to the motions hearing and non-jury trial recorded on February 5, 2016.

2

43). She noted she did not really remember what happened, "and, if you asked me where did [sic] I just put something an hour ago I would probably forget." *Id.* She testified that on the morning of the day in question an incident occurred involving a man named Vladmir. (N.T. 2/5/16 p. 43). She remarked that she was at a store when Mr. Vladmir saw her speaking with someone else. *Id.* Ms. Singleton added that Mr. Vladmir proceeded to tell her fiancé he saw her speaking with someone, which resulted in an argument between Ms. Singleton and her fiancé. *Id.* She stated that after she and Mr. Vladmir began to argue, he punched her in the face. (N.T. 2/5/16 p. 44).

Ms. Singleton testified that subsequent to being assaulted, she personally did not contact the police, but her neighbor did after witnessing the assault. (N.T. 2/5/16 p. 44). Ms. Singleton stated that no officer came to speak to her after her neighbor contacted the police. *Id.* She also stated that she did not know whether Mr. Vladmir was arrested and that following the assault she was taken to the hospital to get stitches. (N.T. 2/5/16 pp. 44, 45). Ms. Singleton testified that once the police arrived at the hospital, they asked her what happened, to which she replied she was assaulted by Mr. Vladmir. (N.T. 2/5/16 p. 45).

Ms. Singleton testified that subsequent to getting stiches she went home, where it was chaotic because there was an abundance of individuals in front of her house curious to know what had occurred. (N.T. 2/5/16 pp. 45, 46). She stated that she was frustrated by their presence and about being assaulted. *Id.* She testified that a sizeable number of individuals came up to her and inquired what occurred. (N.T. 2/5/16 pp. 46, 47). She further testified that she did not recognize Julian Abron or Malik Easley as being one of the individuals who were outside of her house on the day in question. (N.T. 2/5/16 p. 47).

Ms. Singleton testified that "a lot of people was [sic] upset that my fiancé was a lot bigger than Vlad and when Vlad hit me, my fiancé hit him." (N.T. 2/5/16 p. 47). She further noted that

3

subsequent to a myriad of individuals coming up and speaking to her, she called 911 around 6:00 p.m. because there was such a large quantity of individuals outside of her house. (N.T. 2/5/16 p. 48). She further explained that they were aggressively asking her questions and she felt threatened and unsafe, especially since she was assaulted earlier. *Id.*

When she listened to Commonwealth Exhibit 1 (C-1), a 911 telephone call to police, Ms. Singleton recognized her voice and recalled that she had mentioned on the call that she had gone to the 12th District a couple of times that day to make a report. (N.T. 2/5/16 p. 51). Ms. Singleton stated she made this call because she felt threatened by the entire ordeal of the crowd being outside her house. *Id.* She also stated that crowd members kept placing something in the trunk, that a man put something in the trunk earlier that day. (N.T. 2/5/16 p. 52). She specifically testified that a man placed a gun in the trunk and that she had seen this man at times in the past. *Id.*

She explained that when several men came back to her house, the man who had placed the gun the trunk was not among them. (N.T. 2/5/16 p. 52). Ms. Singleton said, "to be honest this is three years later… Honestly, I really don't remember a lot of things they asked and that it's not coming together for me as one, you know, whole story." *Id.* Ms. Singleton also said the trunk of the car referred to was the green Grand Marquis car that she provided the license plate number to in the phone call. (N.T. 2/5/16 p. 53). Ms. Singleton testified that she did not recognize the Defendant, Julian Abron, or Malik Easley as the man who placed the gun in the trunk of the car. *Id.* She stated that after the 911 call the police came to her house and asked if she recognized the car, to which she replied, yes. (N.T. 2/5/16 p. 54).

She also stated the police asked whether there was anyone in the car she recognized, to which she replied she had never seen these individuals before even though they could have been a part of the crowd outside of her house. (N.T. 2/5/16 p. 54). She was unsure because there was

4

such a large crowd. *Id.* Ms. Singleton testified that while she could not recall precisely how many individuals the police were asking her to identify at the green Grand Marquis, she recalls there was more than one and she was asked only about men. (N.T. 2/5/16 p. 55). Ms. Singleton testified that after being asked to identify individuals, she went to 55th and Pine Street and met with Detective Eves to provide her statement. *Id.*

When asked about Commonwealth Exhibit 2 (C-2), the police statement she provided to Detective Eves, Ms. Singleton testified that while the statement was similar to the situation which occurred she could not say with certainty that the statement was accurate, stating, "honestly don't remember and I don't know." (N.T. 2/5/16 p. 58). Ms. Singleton reiterated she has a medical condition but the statement was vaguely similar to what transpired: there was arguing outside of her front door with men, but she did not recall the specific details of the statement. (N.T. 2/5/16 p. 59). She noted that presently she could not recall whether the car was in fact green or not. *Id.* She also noted the referenced police statement she gave was furnished on the same day of the incident. *Id.* Ms. Singleton testified the statement she gave to Detective Eves on July 17, 2013 was accurate according to what she remembered happening at the time. *Id.* Ms. Singleton further testified that she did not know if the statement before her was the same statement she provided or whether facets of it had been altered. (N.T. 2/5/16 p. 60). She stated that subsequent to furnishing the statement, she went to a hearing in front of the grand jury, though she did not recall the precise date. (N.T. 2/5/16 p. 64).

When asked about Commonwealth Exhibit 3 (C-3), the grand jury hearing questions and answers, she stated she recalled being asked questions at the grand jury hearing. (N.T. 2/5/16 p. 65). Ms. Singleton testified that at the grand jury hearing she stated that the Defendant was light-skinned. (N.T. 2/5/16 p. 120).

5

On cross-examination, after being asked about Commonwealth Exhibit 2 (C-2), the police statement, Ms. Singleton testified she could not tell whether the facts of the statement were accurate or not. (N.T. 2/5/16 p. 66). Ms. Singleton also testified that her medical condition may affect her memory and prevents her from getting sufficient oxygen into her brain. (N.T. 2/5/16 p. 67). She stated that her medical condition affects her memory to such an extent that she has difficulty with short-term recollection on a daily basis and it prevents her from recalling the events in question accurately. (N.T. 2/5/16 p. 68). She also stated that while she recalls providing descriptions of several individuals, she did not recall her description of specific individuals. *Id.* Ms. Singleton noted that she was asked whether she knew anyone at the green Grand Marquis. *Id.* Ms. Singleton also noted that she did not recall if the Defendant, Julian Abron, was sitting on the same bench as she was last week across from the courtroom. (N.T. 2/5/16 p. 70). She testified that while she sat for over an hour on a bench across from the courtroom with the Defendant the previous week, she did not remember him nor would she have done so if she believed he were among the individuals who had threatened her on the day in question. (N.T. 2/5/16 pp. 70-71).

Philadelphia Police Sergeant Jonathan Eves, assigned to the 19th District, testified that on July 17, 2013, in the afternoon hours, he was the assigned investigator for an incident that occurred on 2100 block of South Gould Street and he took written statements from Ms. Singleton as part of his investigation. (N.T. 2/5/16 p. 72). Upon being questioned about Commonwealth Exhibit 2 (C-2), Sergeant Eves testified that he recalled it as the statement he took from Ms. Singleton. (N.T. 2/5/16 p. 73). He noted that Ms. Singleton's signature was signed at the bottom of the document and that he had given her a chance to read and review the statement before signing. (N.T. 2/5/16 p. 74). He further noted that Ms. Singleton had not mentioned any mental or physical conditions which would have impaired her memory, nor did she appear to have any difficulty answering the

6

questions. *Id.* Sergeant Eves stated that while Ms. Singleton was answering the questions, she appeared to be scared. (N.T. 2/5/16 p. 75). Sergeant Eves further stated that Ms. Singleton exhibited physical manifestation of fear. *Id.* He stated that she "was talking a little fast and she was definitely shaken a little bit. She told me numerous times that she was scared about giving a statement and everything." *Id.*

On cross-examination, Sergeant Eves explained his process for taking statements was for him to type precisely what the interviewee said as they spoke. (N.T. 2/5/16 p. 76). He further explained that after typing precisely what the interviewee says, he gives them a chance to read and review it prior to signing. *Id.* When questioned whether he asked Ms. Singleton if she had an injury at the time she gave the statement, he replied, "I probably did. It was three years ago… I believe she told me in her statement that she was coming home from the hospital." (N.T. 2/5/16 p. 77). Sergeant Eves noted at the time of the statement he felt no need to inquire into whether Ms. Singleton was taking medication because her statement was very coherent. *Id.* He also noted that he did not recall every question exactly and a reason why he did not recall that Ms. Singleton was injured was because she was not injured in the incident he was responsible for, the crowd and threats outside of her house. (N.T. 2/5/16 p. 78). He explained it was not until the defense attorney mentioned her busted lip that he remembered it. *Id.*

On redirect-examination, Sergeant Eves stated Ms. Singleton took public transportation to the location of the grand jury hearing and that he executed a search warrant on a green Buick with Pennsylvania tag JCC-9621. (N.T. 2/5/16 p. 80). He also stated this occurred in the early morning hours of July 18, 2013, and that he did not recover anything from the vehicle. (N.T. 2/5/16 p. 81).

Philadelphia Police Officer Thomas Brown, assigned to the 6th District, testified that on July 19, 2013, at approximately 6:15 p.m., he performed his tour of duty at 2200 South 65th Street

7

in the City of Philadelphia. (N.T. 2/5/16 pp. 82-83). Officer Brown testified further that he was working with his partner, Officer Ritaldato, in a marked police car when they responded to a radio call for a person with a gun. (N.T. 2/5/16 p. 83). Officer Brown explained that he believed the call also mentioned a green vehicle with Pennsylvania tag JCC-9621. *Id.* He noted that he and his partner located this vehicle on 2200 South 65th street, which is only approximately two blocks away from 2100 South Gould Street. *Id.* He remarked that only about a minute passed between the dispatch call and when he stopped his car. (N.T. 2/5/16 p. 84). Officer Brown testified that when he pulled over the green car, two males were inside the vehicle: the Defendant, Julian Abron, and Co-Defendant, Malik Easley. *Id.* In response to being questioned if Ms. Singleton manifested any mental of physical conditions at the time in question, he replied, "not that I can recall." (N.T. 2/5/16 p. 85).

On cross-examination, Officer Brown testified that he could not recall the description he received of the male individuals, the Defendant and Mr. Easley, just the car. (N.T. 2/5/16 p. 86). Officer Brown stated the dispatch call described a man with a gun. *Id.* He further testified he and his partner searched the two males for their safety and did not recover a gun on either of them. *Id.* He stated he did not remain with the vehicle the entire time before the detective executed a search warrant because after the males were detained and identified they brought all the paperwork up to the Southwest Division. (N.T. 2/5/16 p. 87). He added that another marked vehicle remained with the green Grand Marquis. *Id.* Officer Brown testified that he did not recall the description of either Defendant. *Id.* When presented with Defense Exhibit 1 (D1), a photograph of the Defendant, Officer Brown noted the photograph was how the Defendant appeared when he was arrested, but he stated, "I cannot remember if he is darker-skinned or not, counsel." (N.T. 2/5/16 p. 91).

8

Philadelphia Police Officer John Godlewski, assigned to the 12th District, testified that on July 17, 2013, in the afternoon hours, he responded to a radio call when he first came into contact with Ms. Singleton on 2134 Gould Street. (N.T. 2/5/16 pp. 93-94). He further testified that he was working with his partner, Officer Flanagan. (N.T. 2/5/16 p. 93). When presented with Commonwealth Exhibit 4 (C4), a 75-48 prepared after speaking with Ms. Singleton, Officer Godlewski stated he recognized it. (N.T. 2/5/16 p. 94). Officer Godlewski noted that once he came into contact with Ms. Singleton she told him what occurred and did not appear to be mentally or physically impaired. *Id.* He testified that subsequent to speaking with Ms. Singleton, they took her to 65th and Paschall Avenue for an identification of two males, the Defendant and Malik Easley. (N.T. 2/5/16 p. 95). He stated that he recognized both Defendants in the courtroom. *Id.* Officer Godlewski testified that when Ms. Singleton was questioned if they could identify anyone, she positively identified the Defendant and Mr. Easley as the males that approached her at her house. (N.T. 2/5/16 p. 98).

On cross-examination, Officer Godlewski testified that once he exited his patrol car he was approximately twenty (20) to twenty-five (25) feet away from Ms. Singleton when she made the identification, but was uncertain if he was standing next to her. (N.T. 2/5/16 pp. 99-100). He explained that both Defendants were facing him and Ms. Singleton, but he could not recall whether she verbally or physically gestured to identify the Defendants. (N.T. 2/5/16 pp. 100-101). Officer Godlewski stated that when Ms. Singleton made the identification he, Officers Brown and Ritaldato, were all standing near the Defendants and Ms. Singleton. (N.T. 2/5/16 p. 101).

Commonwealth Exhibits 5 (C5) and 6 (C6) were marked and moved into the record as the certified certificates of non-licensure for the Defendant and Malik Easley, respectively. (N.T. 2/5/16 p. 106).

9

Co-Defendant, Malik Easley testified that he never said anything to Ms. Singleton, nor did he ever see Ms. Singleton before July 17, 2013. (N.T. 2/5/16 p. 109). Mr. Easley further testified that he did not know a Mr. Vladmir. *Id.* On the day in question, Mr. Easley stated that he did recall being stopped by the police twice. (N.T. 2/5/16 p. 110). He explained that he was first pulled over at approximately 9:00 a.m. and stopped by two officers on his way to work. *Id.* He explained that he was coming from a store when a police car pulled up and an officer questioned if he knew anything regarding an incident which occurred earlier that day, he replied, "no." *Id.* Mr. Easley noted that he was then searched and asked where he was going, to which he replied he was going to work. *Id.* Mr. Easley further noted that the officer then said, "get in your car and go ahead." (N.T. 2/5/16 p. 111). He testified that subsequent to the officer telling him to leave he heeded those instructions and left. *Id.* He stated later on the same day after returning to the area he was pulled over for a second time. *Id.* Mr. Easley stated that he never had a gun on him that day nor was a gun found in his car. *Id.*

On cross-examination, Mr. Easley testified that he was the driver and owner of the green Buick on the day in question and that the Defendant was his passenger that afternoon. (N.T. 2/5/16 p. 112). He further testified that he was only on 2100 South Gould Street briefly in order to search for a co-worker he wanted to pick up, then he left. *Id.* He stated it was after he left this location and he was pulled over by the police for the first time that he picked up the Defendant, who is also a co-worker. (N.T. 2/5/16 pp. 112-113). Mr. Easley said it was when he was driving to drop off the Defendant when the police pulled him over for the second time at approximately 6:15 p.m. (N.T. 2/5/16 p. 113). Mr. Easley reiterated that he was never actually on the block of 2100 South Gould Street. *Id.*

10

Mr. Easley testified that while he heard the prosecution play a 911 call which mentioned a license plate number, he did not recall if the plate number was his. (N.T. 2/5/16 p. 114). Mr. Easley also testified he never spoke with or saw Ms. Singleton on the day in question. *Id.* He stated that he picked up the Defendant at his home at approximately 11:00 a.m. when he drove the Defendant to work, and as he was driving the Defendant home they were stopped by the police. (N.T. 2/5/16 p. 115). Mr. Easley testified that the Defendant was with him the entire day, and never on Gould Street. *Id.*

## III. ISSUES

In the Pa. R.A.P. 1925(b) Statement of Matters Complained of on Appeal, the Commonwealth identifies the following issue:

> 1. Did the trial court err in arresting judgment and vacating the guilty verdict where the evidence was legally sufficient to prove intimidation of a witness, retaliation against a witness, and criminal conspiracy?

## IV. STANDARD OF REVIEW

A challenge to the sufficiency of evidence is a question of law. *Commonwealth v. Heater*, 899 A.2d 1126, 1131 (Pa. Super. 2006). A reviewing court may not weigh the evidence or substitute its own judgment for that of the fact-finder, who is free to believe all, part, or none of the evidence. *Commonwealth v. Adams*, 882 A.2d 496, 498-99 (Pa. Super. 2005). The Commonwealth may satisfy its burden of proof entirely by circumstantial evidence. *Id.* at 499. "If the record contains support for the verdict, it may not be disturbed." *Id.*

The appellate court may only consider the evidence from the Commonwealth's witnesses coupled with the evidence of the prosecution that, when read in the context of the entire record, remains un-contradicted. *See Commonwealth v. Henry*, 943 A.2d 967, 969 (Pa. Super. 2008), *appeal denied*, 598 Pa. 787, 959 A.2d 928 (2008) (citing *Commonwealth v. Mistler*, 912 A.2d

11

1265, 1268 (Pa. 2006)). An appellate court must "determine whether the record supports the suppression court's factual findings and whether the legal conclusions drawn by the suppression court from those findings are accurate." *Id.* "Where the record supports the factual findings of the trial court [an appellate court is] bound by those facts and may reverse only if the legal conclusions drawn therefrom are in error." *Commonwealth v. Bomar*, 826 A.2d 831, 842 (Pa. 2003).

Additionally, "[i]t is within the suppression court's sole province as fact finder to pass on the credibility of witnesses and the weight to be given their testimony." *Commonwealth v. Elmobdy*, 823 A.2d 180, 183 (Pa. Super. 2003). The suppression court may "believe all, part or none of the evidence presented." *Commonwealth v. Benton*, 655 A.2d 1030, 1032 (Pa. Super. 1995) (citing *Commonwealth v. Williams*, 602 A.2d 350, 353 (Pa. Super. 1992)). "Credibility at a suppression hearing is an important determination best resolved through the court's personal observations." *Commonwealth v. Camacho*, 625 A.2d 1242, 1245 (Pa. Super. 1993).

## V.    DISCUSSION

In the sole issue on appeal, the Commonwealth argues that this court erred in arresting the judgment and vacating the guilty verdict where the evidence was legally sufficient to prove intimidation of a witness, retaliation against a witness, and criminal conspiracy. This court disagrees. It was within the exclusive province of the trial court as fact-finder to resolve conflicts in the testimony and to believe all, part, or none of the evidence. The trial court did not abuse its discretion in arresting the judgment and vacating the guilty verdict on the weight of the evidence.

When there is witness testimony, the credibility of a witness may be impeached (1) by showing that on a prior occasion he made a statement, either oral or written, that is inconsistent with his present testimony; (2) by competent evidence tending to show bias, bad character for truth

12

and honesty, or **defects in memory, perception or capacity** or (3) by the competent contradictory testimony of other witnesses whose versions of the facts differs from that of the witness being impeached. *Commonwealth v. Baez*, 431 A.2d 388, 394 (Pa. Super. 1981)(emphasis added).

Regarding evidence of identification, the Pennsylvania Superior Court has stated:

> [E]vidence of identification need not be positive and certain to sustain a conviction. Although common items of clothing and general physical characteristics are usually insufficient to support a conviction, such evidence can be used as other circumstances to establish the identity of a perpetrator. Out-of-court identifications are relevant to our review of sufficiency of the evidence claims, particularly when they are given without hesitation shortly after the crime while memories were fresh. Given additional evidentiary circumstances, any indefiniteness and uncertainty in the identification testimony goes to its weight.

*Commonwealth v. Valentine*, 101 A.3d 801, 806 (Pa.Super.2014) (quoting *Commonwealth v. Orr*, 38 A.3d 868, 874 (Pa.Super.2011)). Any variances in testimony go to credibility of the witnesses and not the sufficiency of the evidence. *See Commonwealth v. Galloway*, 434 A.2d 1220, 1222 (Pa.1981).

Here, there was insufficient evidence to satisfy a guilty verdict because the sole Complainant's testimony was largely inconclusive as she was unable to identify the Defendant and her memory was unreliable. The Complainant testified and offered to the court that she suffers from a medical condition that creates defects in her memory. During trial, Ms. Singleton, the Complainant, repeatedly testified in great detail that she did not remember everything that occurred that day. "I know why I'm here but I really don't know everything that went on that day." (N.T. 2/5/16 p. 42). She emphasized her lack of memory by adding "and, if you asked me where did [sic] I just put something an hour ago I would probably forget." This led the court to question her ability to perceive the facts as they occurred when sitting as fact-finder in determining the weight of the testimony and credibility of the witness.

13

The Complainant demonstrated at length her inability to identify the Defendant. She testified at trial that she did not recognize the Defendant, Julian Abron, or Co-Defendant, Malik Easley, as the individuals who were outside of her house. (N.T. 2/5/16 p. 47). Further, Ms. Singleton testified that she did not recognize either one as the man who placed the gun in the trunk of the car. (N.T. 2/5/16 p. 53). Moreover, Ms. Singleton testified that while she sat on a bench with the Defendant across from the courtroom the prior week for over an hour, she did not remember him nor would she have done so if she believed he were among the individuals who had threatened her. (N.T. 2/5/16 pp. 70-71). Ms. Singleton also stated that when police asked whether she recognized the individuals in the car, she replied that she had never seen them before even though they could have been part of the crowd outside of her house. (N.T. 2/5/16 p. 54).

The Commonwealth argued that the Complainant's demeanor at trial, including her inability to identify the Defendant and to remember the incident in question, was a result of witness intimidation. This court notes that the Complainant's demeanor could have been the result of exhaustion and disgust after she complained to the court that she was hauled from her home in front of her children the night before trial and forced to spend the entire night in jail. The witness was wrapped in a blanket and wearing pajamas in court during her testimony at trial. The Commonwealth argues that the witness' prior testimony and identification of the Defendant should be given more weight. However, even if this court were to consider the Commonwealth's argument, this court could not ignore the immense discrepancy between the described assailant's light skin tone with the Defendant's darker complexion. When asked about Commonwealth Exhibit 3 (C-3), the grand jury hearing questions and answers, she stated that she recalled being asked questions at the grand jury hearing. (N.T. 2/5/16 p. 65). Most notably, Ms. Singleton testified at the grand jury hearing that the Defendant was light-skinned. (N.T. 2/5/16 p. 120).

14

However, in evaluating Defense Exhibit 1 (D1), the photograph of the Defendant and observing the Defendant in person, this court found that the Defendant, "is not light-skinned today, nor was he in the photograph, nor was he ever light-skinned." (N.T. 2/5/16 p. 129). The great variation in skin tone between what was described in prior testimony, C-3, compared with D-1, laid an evidential foundation before this court for misidentification and reasonable doubt.

Furthermore, police officer testimony was unreliable and inconsistent. Officer Brown testified that once the Defendants were pulled over, two officers brought Ms. Singleton over to the males where they were positively identified. (N.T. 2/5/16 pp. 84-85). While Officer Brown stated the dispatch call described a man with a gun, he testified that no gun was recovered following a search of the Defendants. (N.T. 2/5/16 p. 86). Nor was a gun recovered following a search of the vehicle in the early morning hours of July 18, 2013 as testified to by Sergeant Eves. (N.T. 2/5/16 p. 81). Officer Brown noted that he was standing next to the Defendants when they were removed from the car, but that he received a radio confirmation of an identification from another officer. (N.T. 2/5/16 p. 88). When presented with Defense Exhibit 1 (D1), a photograph of the Defendant which clearly depicted him having darker skin on the day in question and was consistent with how he appeared in court, Officer Brown stated, "I cannot remember if he is darker-skinned or not, counsel." (N.T. 2/5/16 pp. 90-91). However, Officer Godlewski testified that Ms. Singleton positively identified the Defendants either orally or through a gesture, with Officer Brown present, in contradiction to Officer Brown's testimony of receiving radio confirmation of the identification. (N.T. 2/5/16 pp. 100-101). This testimony in conjunction with that of the Complainant led this court to doubt the identification of the Defendant.

Therefore, all the reasonable inferences deduced from the evidence were insufficient to establish all the elements of the offenses beyond a reasonable doubt.

15

## VI.    CONCLUSION

For all of these reasons, this court's decision should be affirmed.

BY THE COURT:

SIERRA THOMAS STREET, J.

Dated: August 11, 2016